## PARDEE v. ALDRIDGE.

ERROR TO THE COURT OF CIVIL APPEALS FOR THE FIFTH SUPREME JUDICIAL DISTRICT OF THE STATE OF TEXAS.

No. 137. Argued January 19, 20, 1903.—Decided March 16, 1903.

Where a railroad company mortgages its road including all appurtenances and appendages of said railroad, and the property of said company now acquired, or which may be acquired, used for and pertaining to the operation of said railroad, a sale under such mortgage does not include property acquired by the company after the mortgage for the purpose of subdivision and sale; and it is a question for a jury to determine, whether the land so purchased was to be used for and pertaining to the operation of the railroad or not.

A suit to foreclose a mortgage is not a proceeding *in rem* which will bind persons who are not parties thereto, and the fact that the decree covered the property in question does not conclude strangers to the suit.

THE case is stated in the opinion of the court.

*Mr. Maxwell Evarts* for plaintiffs in error. *Mr. R. S. Lovett* was on the brief.

*Mr. W. J. Moroney* for defendants in error.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is an action of trespass to try title to land brought by

Aldridge and others, trustees, against Pardee and others, the plaintiffs in error. The only parcels here in controversy are two tracts, known as the Hughes and Slaughter tract and the Mays tract. Both parties claim title under the Texas Trunk Railroad Company. Pardee claims under the foreclosure of a mortgage made by the railroad company and some incidental proceedings. Aldridge claims under a sale outside of the mortgage. The question in the case is whether the mortgage embraced these tracts.

Although it may not be necessary, we will state the title on each side a little more in detail before discussing the questions of law. On March 22, 1880, the Texas Trunk Railroad Company mortgaged its road, "including all appurtenances and appendages of said railroad, and the property of said company now acquired or which may be acquired, in the State of Texas, used for and pertaining to the operation of said railroad." This was to secure bonds. Later in the same year, although the deed was dated earlier, the Hughes and Slaughter tract was conveyed to the railroad. The Mays tract was conveyed the next year. On January 31, 1883, there was a decree of foreclosure on the mortgage in the United States Circuit Court, and there was a sale on the first of the following May. The purchasers organized a new company, under the old charter, but a distinct organization, as permitted by the local law. In 1885 the property of the second company was sold by the sheriff, on execution following a judgment in the state court, and also by the United States marshal, under an order of sale for failure to pay certain sums as provided in the original foreclosure proceedings. The same persons purchased at both sales and organized a third company, still under the old charter. On August 30, 1888, the third company made a mortgage of the railroad. A bill to foreclose this was filed in the United States court on September 4, 1891, a decree of foreclosure was made in 1895, and Pardee, the plaintiff in error, purchased at the sale, for the benefit of himself and C. P. Huntington. Thus it will be seen that the title of the plaintiffs in error depends, as we said, on the question whether the original mortgage embraced the land in suit.

Before the first foreclosure, but after the execution of the mortgage, suits were begun against the first corporation, and in 1887 a judgment was rendered against it in one of them. On this judgment executions were issued and the parcels of land in suit were sold to the trustee for Downs and his associates, the defendants in error. The trustee brought a suit to try title against the trustees and surviving directors of the first company and a receiver of the third company, and got judgment on April 7, 1898. The defendant directors and trustees also executed a deed to him, and he afterwards conveyed to the present trustees for Downs. If the first mortgage embraced the land, Downs got no rights, but except for that question and one other to be mentioned, his title is not in controversy here, and we do not go into it in detail. The trial court gave judgment for Pardee and Huntington as to the tracts in question, but the judgment was reversed by the Court of Civil Appeals, and final judgment was entered in that court in favor of the trustees for Downs. 24 Tex. Civ. App. 254. A writ of error was refused by the Supreme Court of the State. The case is brought here by writ of error on the ground that due effect was denied to decrees of the United States court. *Dupasseur* v. *Rochereau,* 21 Wall. 130. See *Sweringen* v. *St. Louis,* 185 U. S. 38, 41. As we are of opinion that the judgment of the Court of Appeals was right, it is less important than otherwise it would be to discuss the grounds upon which we think that there is jurisdiction, and we shall proceed at once to the merits of the case.

If the disputed parcels of land came under the mortgage when they were acquired, they did so as "property used for and pertaining to the operation of said railroad." At the trial evidence was taken on the question whether these parcels were used for or did pertain to such operation. The defendants in error disclaimed to the extent of a right of way one hundred feet wide, fifty feet on each side of the center line of the railroad. But there was testimony that the company, when it purchased, intended, after using what was necessary for tracks on the west side, to lay out the rest of the Hughes and Slaughter land in lots and sell them to the employés of the road. So as

to the Mays tract; what was needed was taken for tracks and to get sand, and the rest was to be cut up into lots. Both parcels were returned each year for taxation as "lands and town lots . . . exclusive of right of way and depot grounds," in the inventory of the company. The judge instructed the jury to return findings on two special issues to the following effect: As to the Hughes and Slaughter land, the intention of the company was to put there the main track, part of the sheds, and whatever switches and side tracks should be necessary to the operation of the road, and if they did not occupy all of the land to sell lots on the eastern side to its employés. The land was was not cut up and no lots were sold. The company built its main track on the west side, a **Y** extending eastwardly across the land to beyond its centre, and a small house, used as a ticket office and car shed. This was the only land the road owned in Dallas when it terminated, and if it had been constructed and operated properly it would have needed as much as twenty-five acres (the size of the tract) for terminal purposes. As to the Mays tract, the intention was as above stated. The main track was built across it on the east, and a spur track was built to reach the sand. It would be necessary to use sand properly to construct and operate the road.

The foregoing findings were merely the result of rulings on the evidence. But the jury found, on other special issues submitted to them, that all but one hundred feet off the west boundary of the Hughes and Slaughter tract was acquired for the above stated purpose of subdivision and sale, that any use of the rest of the land in connection with the operation of the railroad, except the hundred feet, was only of a temporary character, and that there was no such use of the rest of the land except of so much as was occupied by the **Y**. There was evidence that the company expected to use another tract for terminal purposes, although it never got the deed. The jury further found that no part of the Hughes and Slaughter tract above what was disclaimed was necessary for the construction, equipment or operation of the railroad when the first mortgage was foreclosed. Also, they found that all of the Mays tract was acquired for the purpose of subdivision and sale. As there

was evidence warranting these findings, and as the findings dealt with pure matters of fact, which it was the province of the jury to determine, so far as there was a conflict between them and those which were made under instructions, those which expressed the free judgment of the jury would prevail. We have no concern with the arguments which are urged here in favor of different conclusions. It is enough that there was some evidence to support the free findings of the jury, and that being so, those findings establish the facts, as was held by the Court of Appeals.

On the findings which we have recited the land in dispute was not property used for and pertaining to the operation of said railroad, and the ruling of the Court of Appeals was right. Some point is made of the disclaimer, which is said to have been arbitrary in amount and not based on evidence. But a party may disclaim what he likes, in advance of the evidence, and is not bound to give reasons for his course.

One matter remains to be mentioned. A receiver appointed in the second foreclosure suit brought a bill in equity in the United States court against certain persons who had purchased the land in question on other execution sales. One ground of the bill was that the property was subject to the mortgage, and on July 16, 1895, it was so decreed. It is argued that although the trustees for Downs were not parties to this bill, they in some way were affected by the decree, that the proceeding was *in rem*, and that the decree brought the property into the custody of the court so as to invalidate the sale. *Wiswall* v. *Sampson*, 14 How. 52. But a suit in equity is not a proceeding *in rem* properly so-called. It does not purport to summon or invite, by notice or otherwise, all the world to come in, so far as there are any adverse interests. It is more personal even than the common law, and works out its decrees by orders to the defendants. Of course, the adjudication in such a suit does not conclude strangers. As to the decree bringing the property into the custody of the court in such sense as to invalidate the sales under which Downs claims, the receiver being a receiver of the mortgaged property only, and there being no representative of the equity of redemption or of Downs's interest

before the court, it is not to be presumed that any act was done inconsistent with outstanding rights as now established, or that the receiver was put in possession of property which was not embraced in the mortgage. The receiver was in possession of the road, and his right to the portion of the land over which the railroad ran is not disputed, but it does not appear that he held the residue under an adverse claim, or at all. Although declaring his right to the residue to be paramount to a third person, the court left all others free to assert their claims. There is nothing to show that the mode in which the trustees for Downs asserted their rights was unlawful or void. Probably nothing was done under the suit in equity beyond the entering of the decree on July 16, 1895. The principal sale took place before that date.

*Judgment affirmed.*

Mr. Justice White and Mr. Justice Peckham dissented.