CENTRAL TRUST CO. OF NEW YORK v. WASHINGTON COUNTY R. CO.

(Circuit Court, D. Maine. July 6, 1903.)

No. 562.

1. RAILROADS—MORTGAGES—FORECLOSURE—PARTIES.

> In a suit by the holder of a mortgage given by a corporation to foreclose the same, stockholders and bondholders of the corporation may be permitted to intervene. Gregory v. Pike, 67 Fed. 837, 845, 15 C. C. A. 33, 41, explained and applied.

¶ 1. Foreclosure of mortgages in federal courts, see note to Seattle, L. S. & E. Ry. Co. v. Union Trust Co., 24 C. C. A. 523.

2. SAME—ANSWER BY CORPORATION—AUTHORITY OF COUNSEL.

Where, in a suit to foreclose a corporation mortgage, the complainant would be entitled to a default and a decree pro confesso, if no answer had been filed, any question as to the authority of the executive officers of the corporation to employ a solicitor to answer, confessing the bill, is immaterial. It seems that, ordinarily, an answer under the seal of a corporation, by one of the principal officers, cannot be questioned.

3. SAME—CONSTRUCTION OF RAILROAD—OVERPAYMENT—OBJECTION—ESTOPPEL.

Where, at the time a railroad was constructed, no objection was made to the contract by which the company's stocks and bonds were issued in payment therefor, it could not subsequently be objected, after a long acquiescence, in a suit to foreclose a mortgage securing the bonds, that the actual cost of construction was only two-thirds of the par value of the bonds issued in payment therefor, and that the bonded indebtedness secured by the mortgage should therefore be scaled.

4. SAME—ACQUISITION OF OTHER LINE—POWERS.

Where the charter of a railroad company authorized it to construct its main line between certain termini, and also "to build branches or extend its line into one or more towns," the railroad was empowered to purchase a railroad already constructed, and appropriate as a branch line; and it was not limited to acquiring branch lines by building them.

5. SAME—MORTGAGES—AFTER-ACQUIRED PROPERTY.

Where a railroad mortgage, in describing the property, contained the language, "and also all rights, powers, privileges, and franchises relating to or useful for the said railroad or branch, including the right to operate and maintain the same, whether now held or acquired by the mortgagor," such mortgage covered a line subsequently purchased by the mortgagor, which was an appropriate branch for the main line mortgaged.

6. SAME.

Where, in a suit to foreclose a railroad mortgage, it appeared that the railroad at the time of foreclosure was capable of earning $100,000 annually, applicable to interest or dividends, which would pay 4 per cent. on $2,500,000, the upset price was fixed at $2,300,000.

In Equity.

Butler, Notman, Joline & Mynderse, and Chase Eastman, for Central Trust Co.

Mr. Littlefield, for intervening petitioners.

Curran & Curran, N. & H. B. Cleaves, and S. C. Perry, for Washington County R. Co.

Heath, Andrews & Dutton, for county of Washington.

PUTNAM, Circuit Judge. This is a bill in equity brought by the trustee under a mortgage of the Washington County Railroad Company, executed on the 10th day of March, 1898, to foreclose the same by sale as provided in the deed. The entire amount of the bonds issued was $2,320,000, bearing interest at 5 per cent. per annum. None of the coupons attached thereto have ever been paid, but no bill to foreclose was filed until this, on the 18th day of April, 1903.

The only parties to the bill are the complainant and the Washington County Railroad Company. The county of Washington, which holds all the preferred stock of the mortgagor corporation, amounting to the par of $500,000, and James Mitchell, holder of something over $70,000 of the mortgage bonds referred to, have severally asked leave to intervene. In Gregory v. Pike, 67 Fed. 837, 845, 15 C. C. A. 33, it was held that the chancellor has no power to make new parties defendant against the objection of the complainant. It was shown,

however, on page 846, 67 Fed., page 41, 15 C. C. A., that this rule does not apply to cases of the coming in of a cestui que trust, or a stockholder as stockholder, under circumstances like those at bar. It applies only where those who seek to intervene make issues which would not be disposed of so as to become res adjudicata provided they were not made parties. Under the circumstances, we deem it equitable to grant the petitions for intervention on special terms expediting the litigation, as set out in the orders in reference thereto which we will cause to be entered.

Previous to the petitions to intervene the Washington County Railroad Company had filed an answer admitting substantially all the allegations in the bill, so that, on the face of the pleadings as they thus stood, the complainant was undoubtedly entitled to a decree. It is claimed by the county of Washington that this answer was put in by the president and the general counsel of the defendant corporation without special authority to either so to do. Ordinarily, an answer under the seal of the corporation by one of the principal officers thereof cannot be questioned. However, it is not necessary for us to consider this contention, because, if the answer were invalid, as claimed by the county of Washington, the complainant would be entitled to a default and a decree pro confesso; also, being the answer of a corporation, it is, in effect, nothing more than a pleading, and cannot prejudice in any substantial manner whatever propositions may be made by the interveners. Therefore we leave the answer to stand.

Immediately on the filing of the answer, and before petitions for intervention were filed, the parties to the record submitted to the court a draft decree. Thereupon the petitions for intervention were presented to the court. The court postponed the consideration of the petitions until the coming in of the report of the special master, to whom the court referred the pleadings and the draft decree, with directions to hear the county of Washington, and Mitchell, as well as the parties to the record, and their proofs, and to include in his report his findings on the propositions which might be submitted by either of them to him, and to allow either of them to take exceptions, to be returned with his report. The report of the master has now been returned into court, with exceptions taken thereto by the county and by Mitchell, none coming from the parties to the record. Thereupon, as we have already said, we admitted the county of Washington and Mitchell as interveners, thus giving us proper jurisdiction over their exceptions.

It appears that the entire length of the railroad of the defendant corporation within the termini distinctly specified in its charter—that is, from a junction with the railroad of the Maine Central Railroad Company in Hancock county to its present terminus in the city of Calais, and its branch to Eastport, also expressly described in its charter—is 119 miles. Of this, $3^{15}/_{100}$ miles, constituting its terminus in the city of Calais, were acquired as hereinafter stated. The balance of the railroad thus expressly described in its charter, namely, 119 miles, less $3^{15}/_{100}$ miles spoken of, was constructed prior to the 30th day of June, 1899, by the parties who now hold all of the bonds secured by the mortgage in question, aside from those owned by

Mitchell, and others to the amount of the par of $4,000, with accumulated interest. The entire issue of bonds was $2,320,000, as already stated. In addition thereto, and to the preferred stock, there was an issue of 15,000 shares of the common stock of the defendant corporation of the par value of $100 each. The parties who thus constructed the railroad received in payment for the cost of construction 14,974 shares of common stock and $2,142,000 of the mortgage bonds in question, and on receipt of the same they entered into the control of the defendant corporation, and have ever since remained in control of it. No objection was ever made by the county of Washington, or by any person, to this arrangement, and the county, and every one concerned, acquiesced in reference thereto until the present bill was filed. It is now maintained by the county that the bonded indebtedness should be scaled down, because it is claimed that the actual cost of construction was only about two-thirds of the par of the bonds issued in payment therefor. If the court were compelled to pass on the issue, it would probably find, as a matter of fact, that the arrangement as described was in truth consented to by all the parties in interest and was satisfactory to them. However that may be, it is now too late to question the transaction in the federal courts. It is hardly necessary to cite authorities on this point, and therefore we will only refer to Pittsburg Railway Company v. Keokuk Bridge Company, 131 U. S. 371, 381, 9 Sup. Ct. 770, 33 L. Ed. 157. The transaction was neither unusual nor unreasonable. The parties constructing the railroad took their risk of gain and loss, and, apparently, if the court accepted the highest value which it has been suggested could be reasonably placed on the property, after making allowance for loss of interest, there has been neither the one nor the other to any substantial amount. Therefore there is no reason which would justify us in sustaining the proposition of the county of Washington in this respect.

In addition to the railroad, which was constructed as we have already said, the defendant corporation acquired a line, already in operation, extending from the present terminus of the defendant corporation in the city of Calais to Princeton. This was approximately 20 miles in length. Deducting the portion used by the defendant corporation for its line within its expressly chartered termini leaves the length of what was thus acquired approximately 17 miles.

The terms of this charter, followed, as it was, by the subscription to the preferred stock, shows, what is also a matter of common knowledge, that the purpose of the undertaking was to accommodate and develop the county of Washington. The whole line from Calais to Princeton is within that county, and it is a natural feeder to the main railroad of the defendant corporation, and is naturally served by it, and the connection of the two and their practical union are apparently results which would naturally follow the general purpose of the enterprise and aid what it sought to accomplish.

The acquisition of this line to Princeton, however, was subsequent to the execution of the mortgage in question. Therefore, as we have said, the county of Washington claims that it should not be covered by this decree of foreclosure. The master found otherwise,

and has put the case so clearly that we can hardly add anything to what has been said by him. We will, however, select Pennock v. Coe, 23 How. 117, 16 L. Ed. 436; Branch v. Jesup, 106 U. S. 468, 486, 1 Sup. Ct. 495, 27 L. Ed. 279; Bear Lake Company v. Garland, 164 U. S. 1, 15, 17 Sup. Ct. 7, 41 L. Ed. 327; Pardee v. Aldridge, 189 U. S. 429, 23 Sup. Ct. 514, 47 L. Ed. 883, and Hamlin v. European & North American Railway Company, 72 Me. 83—as illustrating how liberally the federal courts and the local courts in Maine support provisions in mortgages of franchises of railroad corporations with reference to property subsequently acquired, which is of appropriate use in connection with such franchises. These cases, among other things, settle that with reference to realties and lines of railway subsequently acquired, provided they are incidental to the purposes of the franchise, it is entirely unimportant whether they are obtained by purchase or construction or by condemnation or deed.

By the charter of the Washington County Railroad Company, it was not only authorized to construct a main line of road between the termini which we have named, with a branch to Eastport, but also "to build branches or extend its lines into one or more towns, and operate the same with steam or other motive power." Of course, the words "one or more towns" leave the construction of this clause indefinite. It may well be said that it was not intended to permit correspondingly indefinite authority to "build branches," or to "extend its lines," for indefinite distances, including the possibility of paralleling other railroads. Considering the general purview of the charter, and especially the words "other motive power," which undoubtedly contemplated what are known as "trolley lines," which, at the date of the charter, extend ordinarily only short distances for local uses, it can hardly be questioned that the purpose of this provision was to enable this corporation to develop the county of Washington, as we have already suggested. Therefore, while we are not called on to determine, and it might be impossible to theoretically determine, the minimum or the maximum of the powers thus given to the Washington County Railroad Company, yet we can hardly doubt that the building of branches within the county, no longer than the line to Princeton, not injurious to other enterprises, and natural feeders to the main railroad, is within the purview of this provision of its charter. Neither, in view of the authorities to which we have referred, and especially in view of the broad expression, "extend its lines," found in this extract from the charter, can we have any doubt that extension by purchase was authorized, as well as extension by construction, provided, in either case, that no detriment was done to any other existing enterprise. That there was any detriment in this case is not claimed, and it is a matter of common knowledge within this state and district that there was none such. Therefore we think the acquisition of this line to Princeton was an exercise of the franchises which the Washington County Railroad Company possessed at the time its mortgage was executed.

The mortgage, in describing what was embraced in it, contains the following language: "And also all rights, powers, privileges, and franchises, relating to or useful for the said railroad or branch, includ-

ing the right to operate and maintain the same, whether now held or hereafter acquired by the mortgagor." We have already shown that the acquisition of this line to Princeton was within the exercise of franchises possessed by the respondent corporation at the time the mortgage was executed; but a question is raised by Washington county arising out of the two words, "relating to or useful for the said railroad or branch." The word "branch," in this connection, undoubtedly means the main line between the specified termini in Hancock county and the city of Calais; but there can be no question, in view of the facts which we have stated, that the line to Princeton was, as we have already said, a feeder to the main line, and was served by it, and therefore came within the words, "relating to or useful for the said railroad." This is emphasized by the fact that a part thereof, some three miles in length, as we have already said, was properly, and we have no doubt economically, made a portion of the main line. Therefore we hold that the line to Princeton should be covered into the decree.

This disposes of all the exceptions taken by the county of Washington to the report of the master, and leaves for consideration only a single exception taken by Mitchell. The master fixed the upset price of the property to be sold under the decree of foreclosure at $2,000,000. Mitchell claims that it should be $2,500,000. By the terms of the mortgage the purchaser at a foreclosure sale has the right to make the major payment in bonds, and the decree as reported by the master provides therefor. Where there is nothing of that character in the mortgage or the statutes, and the court is appealed to by the parties to insert it, it may, of course, as incidental thereto, impose equitable conditions as to the upset price, or as to any other topic as to which conditions can reasonably be imposed; but in the present case there is nothing in this feature of the decree, nor in any other feature thereof, which gives this court at the present time jurisdiction, on the mere suggestion of either party, to fix an upset price. Nevertheless Mitchell appeals to us to do so, and the complainant consents that we should. The complainant, perhaps, is wise in this, because, in the absence of an upset price, the sale, being subject to confirmation, might be set aside on the ground that the bids were insufficient, and the final disposition of the property be embarrassed and delayed. Consequently it is proper for the parties to agree that the court should at the present time determine the upset price. Therefore we accept the jurisdiction in this respect which the parties desire us to exercise.

A careful examination of the facts satisfies us that the property at the present time is capable of earning at least $100,000 annually, applicable, on conservative rules, to interest or dividends. The past history indicates that the future will show larger net returns, but we are not justified in speculating on this. Events may occur which will diminish the net income notwithstanding the expectation of its increase. We are, however, justified by the continuous growth which the past has developed in taking the present net earning capacity of the property as indicating the value which shall be set on it for an upset price. This is to be estimated in view of the fact that the property

can be made dividend earning as well as interest paying. As dividend earning, it would pay 4 per cent. on $2,500,000, which, on a fair basis, would justify a valuation at that figure. We should, however, allow for the fact that a purchaser would be expected to make a reasonable profit, and that there are embarrassments and difficulties often met with in converting an enterprise like this into a dividend paying property.

We deduct for all that $200,000, leaving the upset price to be fixed in the decree $2,300,000.

This disposes of all the questions which were left for us to consider.

It is ordered that the upset price named in the decree for sale shall be $2,300,000, instead of $2,000,000, as reported by the master; that all other exceptions to the master's report are overruled; and that, subject to the modification as to the upset price, the master's report is confirmed; and a decree will be entered accordingly.