SCHWAB .v. SMUGGLER–UNION MINING CO. et al.†

(Circuit Court of Appeals, Eighth Circuit, November 18, 1909.)

No. 3,092.

**1. MORTGAGES (§ 587\*) — OPERATION AND EFFECT OF FORECLOSURE DECREE — RIGHTS OF JUNIOR INCUMBRANCERS NOT PARTIES—"PROCEEDING IN REM."**

A suit in equity for the foreclosure of a mortgage is not a "proceeding in rem" in such sense that the decree and sale therein can cut off rights of third persons, not parties to the suit, in the property acquired from the mortgagor subsequent to the mortgage.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1685–1688; Dec. Dig. § 587.\*

For other definitions, see Words and Phrases, vol. 4, pp. 3481–3483; vol. 8, p. 7684.]

**2. WATERS AND WATER COURSES (§ 158\*) — CONTRACTS CREATING — RIGHT OF FLOWAGE.**

Defendants, who were owners of quartz mills on a stream, entered into contracts with the owner of placer mines situated below, which were worked by means of water taken from the stream through flumes and pipes, by which, for a valuable consideration paid and to be paid, they were released for a stated term from any and all claims for damages by reason of injury to the reservoirs or pipes of the lower proprietor caused by the tailings and débris deposited, or which might be deposited, in the stream by defendants from their mills; the contracts to be binding upon the successors and assigns of the parties. *Held*, that such contracts granted an easement to defendants to have the tailings from their mills flow through the reservoirs, sluices, and pipes upon the placer property, which continued during the designated term as against a subsequent purchaser of the property.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 184, 186–188; Dec. Dig. § 158.\*]

Appeal from the Circuit Court of the United States for the District of Colorado.

Suit in equity by Gustav H. Schwab, trustee, against the Smuggler-Union Mining Company and others. Decree for defendants, and complainant appeals. Reversed.

Pierpont Fuller and Clarence A. Brandenburg (Henry T. Rogers, Daniel B. Ellis, Lewis B. Johnson, and George A. H. Fraser, on the brief), for appellant.

Jacob Fillius and Henry F. May (Charles J. Hughes, Jr., and John S. Macbeth, on the brief), for appellees.

Before SANBORN and VAN DEVANTER, Circuit Judges, and WM. H. MUNGER, District Judge.

WM. H. MUNGER, District Judge. In this case complainant filed his bill in the Circuit Court, in which, among other things, it was alleged: That various described placer mining claims in the state of Colorado, aggregating 777.99 acres, commonly known as the "Keystone claims," were owned by complainant under patents issued by the United States, through and by reason of mesne conveyances from the original locators and patentees, together with certain water rights used in connection with said claims. Said claims were alleged to lie along

both sides of, and on both banks of, the North fork of the San Miguel river, and alongside and upon both sides of the San Miguel river at and below the North and South forks thereof. That on June 1, 1904, the Keystone Hydraulic Mining Company, a corporation organized and existing under and by virtue of the laws of the state of Colorado, being then the owner of all of said mining properties, then and there conveyed the same by its certain deed of mortgage, to the Trust Company of America, a corporation organized and existing under and by virtue of the laws of the state of New York, as trustee, for the purpose of securing an indebtedness then existing against said the Keystone Hydraulic Mining Company, evidenced by its certain bonds in the aggregate amount of $150,000, all of which bonds were then held by complainant as trustee, for his own use and for the use and benefit of other persons owning an interest in said bonds.

On June 15, 1906, in an action brought for that purpose in the Circuit Court of the United States for the District of Colorado, a decree of foreclosure of said mortgage was entered, finding the amount due thereon, and decreeing a sale of the mortgaged premises by a master of the court. On July 23, 1906, the premises were sold under said decree and purchased by complainant as trustee, and on August 6th said sale was confirmed by the court. On May 7, 1907, no redemption from the sale having been made, a master's deed was executed to complainant.

It was further alleged in the bill: That the improvements upon said placer claims consisted, among other things, of two reservoirs, which were placed thereon by the grantors of complainant, situated upon the North fork of the San Miguel river, at the upper part of said placer property and upon a portion of said claims. That said reservoirs were made by means of two dams placed across the river, the upper reservoir having an area of about 160,000 square feet, and the lower reservoir having an area of about 10,000 square feet. That said reservoirs were designed to collect and hold the waters of said river for the use of said Keystone properties. That there were no means whereby the gold in said placer claims could be taken or collected therefrom except by using the water of said North fork of the river in hydraulic mining of said placers. That, in order that said water might be used profitably and successfully, it was necessary that all the water of said stream should be used, and at the point where it was used to be free from tailings and other débris. That the said Keystone properties were so situated as to be of great value for the generating of electric power by means of the waters of the North fork of said river. That such electric power would be readily marketable and the value thereof would greatly exceed the cost of producing and generating. That in order that said water might be profitably and practically utilized for the generation of electric power, it was necessary that the water, where it should flow over the property of complainant, should be so free from tailings and débris that the tailings and débris carried by said water should not fill up or materially decrease the capacity of said reservoirs, or unreasonably to cut or wear out the pipe lines, water wheels, and machinery or other appliances intended and employed in the utilization of such water in the generation of electric power.

The bill alleged: That the defendants and each of them were engaged in mining and milling operations in the county of San Miguel, and each owned and controlled and operated mills for the treatment of ore, located on or about the North fork of said river above the said placer claims of complainant. That the defendants and each of them habitually and constantly discharge and deposit in the North fork of said river, at points above the placer claims of complainant, great quantities of tailings and débris, from their respective mills, which tailings and débris amount in the aggregate to not less than 800 tons per day during the winter of each year and not less than 1,200 tons per day during the remainder of each year. That the tailings and débris so discharged and deposited in said stream by defendants consisted of coarse and sharp quartz sand, commonly called "silica," and finer quartz sand and quartz dust or powder, which, when mingled with said waters, become slime. That said tailings and débris discharged by defendants in said stream were carried by the force of the current along said North fork of said river, where said tailings and débris commingled into one indistinguishable mass before they reached the lands and placer claims of complainant and were carried by said river to the placer claims of complainant and precipitated upon his lands and claims, and his said reservoirs, flumes, pipes, sluices, machinery, and appliances. That the amount of the tailings and débris discharged and deposited in said stream by defendants, and carried to complainant's property and precipitated in complainant's reservoirs, was so great as to be sufficient, in the space of three months, to fill completely said two reservoirs. That while defendants continue discharging said tailings and débris into said stream it will be impossible for complainant to make any practical use of his reservoirs or any of his water rights on the said property. That said tailings and débris so discharged and carried by the waters of said stream to the property of complainant, as aforesaid, were of such a nature that, consisting as they do in a great part of sharp quartz sand, they wear out, and will continue to wear out and destroy, complainant's pipe lines, giants, and other hydraulic machinery and appliances, so completely as to make it impracticable and unprofitable for complainant to use said waters for hydraulic mining or for generating electric power. That complainant's grantors had expended many thousands of dollars constructing and placing upon said property such improvements. That but for the discharging and depositing of tailings and débris by the defendants in said stream the waters thereof, at the point where the river enters complainant's Keystone claims, would be reasonably free from tailings and débris. But that the discharging and depositing of tailings and débris in said stream by said defendants make the waters of said river so polluted and laden with tailings and débris as to be unfit for use by complainant for the purposes aforesaid. It was alleged that the acts of the defendants aforesaid were such as caused complainant great and irreparable damage, such as could not be adequately compensated for in an action at law. The bill prayed that the defendants and each of them be enjoined from discharging and depositing in the North fork of said river, at any point above the point where the said river entered said Keystone properties of complainant, any tailings from their mills or mines, or any débris, or

discharging, depositing, or placing such tailings and débris so near to the banks of said stream that such tailings and débris can fall, flow, or be washed thereinto, so as to be carried by the waters of said river to, upon, or over the land and placer claims of complainant, etc.

To said bill each of the defendants filed an answer, setting up and alleging numerous defenses thereto; but the view which we take of the case renders it unnecessary to refer to but one of such defenses, in which it was alleged that, in August, 1904, the Keystone Hydraulic Mining Company, being then the owner of the properties now claimed to be owned by complainant, entered into an agreement with each of the defendants, whereby defendant was released from all damages, actions, and claims whatsoever, either at law or in equity, which the said Keystone Hydraulic Mining Company, or its successors, might have or or could thereafter have, on account of any tailings which may have been theretofore deposited or which might be thereafter deposited in said river, in consideration of an amount of money paid and agreed to be paid; the agreement with each defendant being in its terms and conditions identical, and in substance as follows:

This agreement made this 26th day of August, A. D. 1904, * * * witnesseth: That, whereas, the said first party is now and for about four years last past has been working and operating a group of placer mining claims known as Keystone, in which mining operations it uses the water of the San Miguel river, by first impounding the same in storage reservoirs, from which it conveys the same through a flume and thence through iron or steel pipe lines to iron or steel giants, through which it is discharged for the purpose of washing down gravel and for other uses in carrying on such placer mining; and, whereas, the said second party, during all of said period of operation of said placer claims by said first party, has been and now is the owner and operator of various quartz mines and quartz mills at points above said works of said first party, from which mills it discharges slimes and tailings made thereat into the San Miguel river or tributaries thereof; and, whereas, said first party claims that such slimes and tailings so deposited in said river and in its tributaries by said second party are carried by the currents of said stream so that the same settle in the impounding reservoirs of the first party and are filling up, and thereby impairing the usefulness of the same, and also claims that such slimes and tailings, when passing with the waters of said river through its said pipe lines and giants, have cut out and thereby greatly injured said pipe lines and giants, and claims that its present pipe line has been injured to such an extent that it is necessary that it purchase and install a new pipe line so that the same may be ready for use and operation by it at the beginning of its next working season, which begins about April 1, 1905, which proposed pipe line is estimated to cost about $8,400:

Now, therefore, for the purpose of adjusting the damages which it is claimed have been done to said first party by the slimes and tailings heretofore discharged into said San Miguel river and its tributaries by the second party, and for the purpose of adjusting the damages which may hereafter be done to said first party by any slimes or tailings which may be discharged by said second party into said river or its tributaries, during the life of this agreement, it is hereby agreed by and between the parties hereto that said second party shall pay to said first party the sum of $3,000, of which sum $333.33 shall be paid upon the execution hereof, $333.33 shall be paid on or before September 19, 1904, and the balance of which sum, $2,333.34, shall be paid when the final payment on account of the purchase price of said new pipe line becomes due and payable from said first party to the manufacturers thereof, which is expected to be about November 15, 1904; and the said second party shall further pay to the said first party on or before the 1st day of August each annual season that said new pipe line shall be in actual and active service during three months of such season the sum of $166.67, providing that said second

party has discharged tailings into said river or any tributary thereof during such season, as its proportion of the expense which may be necessary to repair the giants and the said pipe line on account of the damage which may be done to the same by tailings which may be put into said river or its tributaries by the said second party; and the said first party, in consideration of the agreements hereby made by the said second party, and in consideration of the moneys hereby agreed to be paid to said first party by the said second party, does hereby agree that, when its present pipe line is worn out, it will install a new pipe line at its said claims, which pipe line shall be of a size and quality in its judgment best suited to stand the wear and tear of the water in said river, containing slimes and tailings, and that it will expend in the purchase of material in the actual construction of said pipe line at least the sum of $8,400, and will furnish to the said second party, upon the completion of such pipe line, statements showing that it has expended at least $8,400 in said work; and, in the event that a less sum than $8,400 is so expended, then a rebate of one-third of the deficiency under $8,400 shall be allowed said second party.

And it is further understood and agreed, in consideration of the said moneys to be paid by said second party to the said first party, that the said first party has released and discharged, and does hereby release and discharge, said second party of and from all manner of actions and causes of actions, either in law or in equity, and all suits, debts, sums of money, covenants, controversies, promises, trespasses, damages, claims, and demands whatsoever, in law or in equity, which it now has or ever did have, or which it or its successors or assigns thereafter can, shall, or may have, on account of any slimes or tailings or other materials which said second party has heretofore discharged into said San Miguel river or into any feeder or tributary thereof: and does further release and discharge said second party, its successors and assigns, of and from all manner of actions and causes of actions, suits, trespasses, damages, claims, and demands whatsoever, in law or in equity, which it, the said first party, its successors and assigns, may now have or hereafter can, shall, or may have, for, upon, or by reason of, any slimes, tailings, or similar substances which the said second party, its successors or assigns, may discharge or allow to be discharged, directly or indirectly, into the said San Miguel river, or any feeder or tributary thereof, during the period beginning from the date hereof and ending four years from April 1, 1905—that is to say, March 31, 1909—four years being the estimated minimum life of said proposed new pipe line, and during such further period beyond March 31, 1909, as such proposed new pipe line may last, and be capable of being used by said first party, its successors and assigns, for the purpose of carrying on placer mining operations at the point where the same are now being carried on by said second party.

It is also understood and agreed that said first party shall keep said pipe line in good repair at its own expense during the life of this agreement, so as to prolong the life and usefulness of the same as long as reasonably possible; and the said first party shall construct two sand boxes in its flume in addition to the one now therein, and shall maintain said two new sand boxes as well as the present one, during the life of this agreement, for the purpose of removing, as far as possible, slimes and tailings from the waters to be conveyed through said flume and pipe line.

It is further understood and agreed between the parties hereto that all of the terms and conditions hereof shall be binding upon, and shall inure to the benefit of, the successors, tenants, and assigns of each of the parties hereto, and are and shall be covenants running with the title, ownership, or right of occupation, of said Keystone group of placer mines.

The usual replications were filed, evidence taken, trial had, a decree entered dismissing the bill, and complainant prosecutes an appeal.

That the agreement set forth in the several answers was duly entered into between the Keystone Hydraulic Mining Company and each of the defendants, and that each defendant had made the payments agreed to be made by it, was not disputed. It is, however, said that, as such

agreement was entered into subsequent to the giving of the mortgage deed of trust, the rights of complainant are not affected thereby. The foreclosure proceedings through which complainant acquired his title were had subsequent to the agreement. The defendants were not parties to that action, and their interest, if any, in the subject-matter of the foreclosure, was not affected by the decree and sale. Pardee v. Aldridge, 189 U. S. 429, 23 Sup. Ct. 514, 47 L. Ed. 883; Weed Sewing Machine Co. v. Baker (C. C.) 40 Fed. 56.

It then becomes necessary to ascertain whether this agreement of the parties was merely a personal covenant on the part of the Keystone Hydraulic Mining Company, or whether it gave to the defendants an easement or interest in the properties covered by the mortgage. The agreement gave defendants more than the right to simply deposit the slimes and tailings from their mills into the San Miguel river. Such right they possessed without any permission from the Keystone Hydraulic Mining Company, provided they did not thereby pollute the water, diminish the flow, or otherwise injure the property of said Keystone Company. The object and purpose of the agreement was to give to defendants the right to have the slimes and tailings from their mills flow through the flumes, pipes, sluices, and reservoirs of the Keystone Hydraulic Mining Company, and if, in the exercise of such right, and as an incident thereto, such slimes and tailings were precipitated by the waters of the river upon the lands and claims of said company, then that right was also embraced within the privileges given by the agreement. Scheel v. Alhambra Mining Co. (C. C.) 79 Fed. 821.

In Black's Pomeroy on Water Rights, § 152, it is said:

"It is hardly necessary to state that any private riparian proprietor upon a stream may obtain, as against other proprietors, special rights to use the water in the nature of easements or servitudes farther and greater than those conferred upon him simply as a riparian proprietor. Thus, for example, he may obtain by grant from other proprietors, or by prescription against them, the exclusive right to any portion of the waters of the stream."

In Jones on Easements, § 787:

"A perpetual easement to overflow land is an interest in land which requires an instrument in writing to pass the title to it, and an oral consent or license to flow land does not confer any permanent right or interest, but is revocable at any time."

In Caryon v. Loberling et al., 1 Hurlstone & Norman's Reports, 784, the declaration alleged: That the plaintiff was the owner and lawfully possessed of certain lands and premises and of a certain natural stream of water flowing from and through other lands lying near to and above the lands of the plaintiff into the sea; that the defendants were possessed of lands and of a certain tin mine and china clay works situated upon defendants' lands; and that defendants, in working the same, wrongfully threw sand, stone, rubble, and other stuff into such natural stream of water, flowing through the plaintiff's land, whereby the channel was obstructed and the water flowed over and upon the plaintiff's lands and destroyed their produce. To the complaint defendants' plea, among other things, was: That the defendants were the occupiers of lands near to and above the plaintiff's lands, and owners of a tin mine situated within the lands of the defendants; that de-

fendants and all other occupiers of the land and tin mine of the defendants for 20 years next before the commencement of the suit enjoyed as of right and without interruption the right from time to time, as occasion required, to work the tin mine and to win therefrom tin and tin ore, and, in the course of so working and winning the same of washing away by means of the stream of water in the declaration mentioned, where the same flows through the lands and tin mine of the defendants, the sand, stones, rubble, and other stuff which were dislodged or severed in the course of so working the tin mine, and of casting and throwing from and out of the tin mine the sand, stones, rubble, and other stuff into the said stream, where the same flows through the land and tin mine of the defendants, and of having the same washed and carried away by the flow of the stream towards the sea and towards that part of the channel of the stream which is situated within the lands of the plaintiff; that by reason of the premises a small part of the sand, stones, rubble, and other stuff necessarily became and was deposited and accumulated in and upon that part of the bed or channel of the stream which flowed through plaintiff's premises, and said part of said bed or channel necessarily became and was a little obstructed, filled up, and raised above its natural level, and certain small quantities of the waters of the said stream necessarily a little penetrated and burst the banks of said channel and flowed over and upon the said lands of plaintiff. Upon demurrer it was held by the Court of Exchequer that the defendants' plea was good. The court held that the privilege set forth in the plea was the subject-matter of a grant, and, being the subject-matter of a grant, could be acquired by prescription, and the plea showing that the defendants had exercised the right for the full period of 20 years had obtained a prescriptive right to continue said use. See, also, discussion in Washburn's Easements and Servitudes (4th Ed.) § 7. c. 4.

We think the agreement granted to the defendants an easement to have the slimes and tailings from their mills flow through the flumes, pipes, sluices, and reservoirs upon the properties of complainant in question, and, as a natural incident thereto, upon his said lands, and that such interest of the defendants was not affected by the foreclosure decree and sale; they not being parties thereto.

As this action was commenced before the expiration of the grant, it cannot be maintained; but, as the dismissal of the bill by the court below was an adjudication of all the issues, it is reversed, with directions to enter a decree finding that complainant cannot maintain the action during the life of the agreements mentioned, bearing date August 26, 1904, and that the bill be dismissed on that ground alone, without prejudice to the right of the complainant to maintain a new suit in equity after the rights of defendants, acquired under said agreements of August 26, 1904, have expired.

The appellant will recover one-third of his costs in this court.