## A. D. Aldridge et al. v. E. H. Pardee et al.

### Decided June 30, 1900.

**1. Parties—Trustees of Naked Legal Title May Sue.**

One who holds the legal title as a mere naked trustee may sue in his own name, although the entire equitable title be in another.

**2. Same—Action by Trustee in Behalf of Creditors—Pleading.**

Plaintiff's petition alleged that plaintiffs, as sole trustees of the legal title to the land described therein, brought the suit for the use and benefit of D. and his associates, who were creditors of the Texas Trunk Railroad Company, as variously organized, and their privies and assigns who are beneficially interested in said legal title, and being all such creditors who have authorized and contributed to the expense of the suit; and also for the use and benefit of such other general creditors, if any, having enforcible demand against said company, as are entitled to participate in the benefits of what may be recovered in the suit, and who shall in like manner contribute to the expense of this suit and ratify and adopt said trusts. Held, not subject to special demurrer on the ground that it appears from the petition that plaintiffs are not actually interested in the subject matter of the suit, and are assuming to represent and sue in behalf of others whose names and interests are not disclosed.

**3. Same.**

A further allegation that certain attorneys were authorized to direct the trustees in the litigation was immaterial, as it did not affect the right of the trustees to recover.

**4. Railway Corporation—Dissolution—Directors as Trustees—Conveyance by—Survivorship.**

Upon the dissolution of a railway corporation its property passes, under the terms of the statute, to its directors, to be held by them in trust for the benefit of its creditors (Revised Statutes, articles 682, 4555), and when one or more of the directors die, the survivors take the whole title subject to the trust, and when, owing to reorganizations of the corporation and foreclosure sales of its property, there are conflicting interests to be adjusted, such directors, acting for the best interests of the corporation, may convey the property to yet other trustees, especially where the creditors consent to such action.

**5. Deed—Description of Land—Judicial Decree and Sale.**

What is a certain description of land in a voluntary conveyance is also certain in a judicial decree foreclosing a mortgage, and in the deed made at judicial sale thereunder.

**6. Railroad Mortgage—Description of Land.**

Where a mortgage was given by a railroad corporation upon lands not described by metes and bounds, but as being such as were purchased and to be purchased for the construction and equipment of said railroad, and such as were acquired or as should be acquired in Texas, used for and pertaining to the operation of said railroad, extraneous evidence was admissible to show whether a specified tract of twenty-five acres purchased by the company, along and on one side of which the road was constructed, was covered by the mortgage.

**7. Same—Lands Not Included.**

Such a description of land in a railroad mortgage and decree of foreclosure thereof would not include the unused parts of a tract of twenty-five acres, and another of twelve acres, which the company had bought with the intention of subdividing such parts thereof as should not be actually occupied by its right of way and switch tracks into lots to be sold to its employes.

**8. Execution Sale After Corporation Dissolved.**

A sale under execution is void where the execution was levied on property of a corporation after its dissolution and after the title to the property had passed into its directors as trustees for the benefit of its creditors.

APPEAL from Dallas. Tried below before Hon. JOHN M. AVERY, Special Judge.

*Moroney & Love, J. M. Dickson,* and *W. H. Clark,* for appellants.

*Baker, Botts, Baker & Lovett,* for appellees.

RAINEY, CHIEF JUSTICE.—This is an action of trespass to try title brought by plaintiffs below, A. D. Aldridge, A. F. Hardie, and W. G. Mowry, trustees, for J. E. Downes and associates, against defendants below, E. H. Pardee and Collis P. Huntington, to recover certain lands in Dallas, Kaufman, and Houston counties. It was agreed that the Texas Trunk Railroad Company, incorporated under the general laws of Texas, November 6, 1879, was the common source of title. Under peremptory instructions of the court the jury found for the plaintiff for all the land sued for except two tracts, known as the Hughes and Slaughter tract and the Mays tract. As to these two tracts, various special issues were submitted by the court, and upon the return of the

verdict of the jury judgment was rendered in favor of defendants. From this judgment both plaintiffs and defendants prosecute an appeal.

The evidence shows that the Texas Trunk Railroad Company was duly incorporated November 6, 1879, under title 84, Revised Statutes of 1879. Under this charter there have been three distinct and separate organizations. The original company was sold out under foreclosure sale, and the purchasers reorganized under the original charter. This company was likewise sold out, and the purchasers also reorganized under the original charter. In discussing the questions raised these organizations will be designated, respectively, Company No. 1, 2, and 3.

There were two main issues raised by the briefs of the parties. One is the contention of the defendants that the muniments of title relied upon by plaintiffs fail to make a prima facie case. The other is the contention of plaintiffs that the mortgages under the foreclosures of which the defendants claim title did not embrace the lands in controversy and under which foreclosures the title to the land did not pass.

As to plaintiffs' title the record shows that on November 4, 1881, W. F. Thompson brought suit against the Texas Trunk Railroad Company (No. 1), and March 15, 1887, in said suit judgment was rendered in favor of plaintiff. On March 9, 1895, execution was issued and levied on all the Dallas County land involved in this suit. On August 30, 1895, execution was issued on said judgment to Houston County, and was levied on all the Houston County land involved in this suit. Sales of said land were made by virtue of said executions, and the same was bid in by C. C. Bumpass, as trustee for J. E. Downes and associates, and deeds were made to him by the sheriffs of Dallas and Houston counties respectively.

C. C. Bumpass, trustee for J. E. Downes and associates, brought an action of trespass to try title to recover all the land in litigation against John F. Ely, Jas. B. Simpson, D. A. Robinson, and W. L. Cabell, the surviving directors and trustees of the Texas Trunk Railroad Company as originally incorporated, being Company No. 1, and John H. Gaston as receiver of the Texas Trunk Railroad (No. 3), appointed by the District Court of Ellis County at the instance of the State, and on April 7, 1898, judgment was rendered in favor of said Bumpass, trustee as aforesaid.

On January 16, 1896, C. C. Bumpass, trustee for J. E. Downes and associates, conveyed the land in controversy to A. D. Aldridge, A. F. Hardie, and W. G. Mowry, as trustees for J. E. Downes and associates.

On December 28, 1897, and after after the commencement of the suit of Bumpass, Trustee, v. Ely et al., above mentioned, Jas. B. Simpson, D. A. Robinson, John F. Ely, and W. L. Cabell, as surviving directors and trustees of the Texas Trunk Railroad Company No. 1, deeded to C. C. Bumpass, trustee as aforesaid, the Dallas County lands, and on February 4, 1898, said Bumpass deeded to plaintiffs herein, as trustees, the lands involved in this suit. In this connection it is to be noted that the Texas Trunk Railroad Company, as originally organized, had been sold out, and the purchasers had reorganized under the original charter

at the time of the institution of the Bumpass-Ely suit, and the execution of the conveyances by Simpson and others to Bumpass, trustee, and that said Simpson, Robinson, Ely, and Cabell were the only surviving directors of the original Texas Trunk Railroad Company.

The defendants complain of the court for overruling defendants' special demurrer to plaintiffs' first amended original petition, the ground of demurrer being, that it appears from plaintiffs' petition that plaintiffs are not actually interested in the subject matter of this suit, and are assuming to represent and sue in behalf of others whose names and interests are not disclosed. The proposition of defendants is that "a mere naked trustee, without interest or legal duty with respect to the subject matter of litigation, and appointed only for the purpose of acting as plaintiffs, and without power to direct the litigation, is not authorized to prosecute it."

The petition alleges as follows: "Plaintiffs, as sole trustees of the legal title to the lands and premises hereinafter described, bring this suit for the use and benefit of J. E. Downes and associates, who were creditors of the Texas Trunk Railroad Company, as formerly variously organized, and their privies and assigns who are beneficially interested in said legal title, and being all such creditors who have authorized and contributed to the expense of this suit; and also for the use and benefit of such other general creditors, if any, having enforcible demands against said company, as are entitled to participate in the benefits of what may be recovered herein, and who shall, in like manner, contribute to the expense of this suit and ratify and adopt said trusts. This suit is brought and prosecuted under the direction of Dickson & Moroney, who, as attorneys for J. E. Downes and associates, are authorized to direct such trustees in the recovery, by suit or otherwise, of any of said property that may be held adversely, or to which any person or persons may assert any adverse claim."

The foregoing allegations show that plaintiffs, as trustees, held the legal title to the land, which gives them the right to prosecute suit. It is well settled that one who has a legal title, as mere naked trustee, may sue in his own name, though the entire equitable title be in another. Thompson v. Cartwright, 1 Texas, 87; McMillian v. Croft, 2 Texas, 397; Knight v. Holliman, 6 Texas, 44; Wimbish v. Holt, 26 Texas, 637; Zachary v. Gregory, 32 Texas, 452; Price v. Wiley, 19 Texas, 142; Martel v. Somers, 26 Texas, 551; Smith v. Wingate, 61 Texas, 54; Anderson v. Shaw, 2 Posey Unrep. Cases, 285; Cook v. Avery, 147 U. S., 375.

The allegation that certain attorneys were authorized to direct the trustees in the litigation is immaterial, and does not affect the right of the trustees to recover. The court did not err in overruling the demurrer.

Objection is made by defendants to the action of the court in permitting plaintiffs to introduce in evidence the judgment rendered in favor of W. F. Thompson v. Texas Trunk Railroad Company, and

executions issued by virtue thereof, and sales thereunder, and the conveyances of the sheriff by virtue thereof, the contention being that said proceedings are null, as said corporation had been dissolved prior thereto by the foreclosure under a mortgage and sale thereunder of its franchises. If it be conceded that the contention of defendant is correct, it becomes immaterial in view of the judgment in the case of Bumpass, Trustee, v. Ely et al., above referred to. In that action the court decreed the title óf the land to be in Bumpass, as trustee, and such judgment was an adjudication to Bumpass, as trustee, of such title as the original company had to the land at that time.

Under article 682, Revised Statutes, upon the dissolution of a corporation the property belonging thereto passes to the directors to be held in trust by them for the benefit of corporation creditors. When the original corporation was dissolved by the sale of its franchises, etc., under the foreclosure of the International Trust Company's mortgage, the title to all the property not transferred by the foreclosure sale vested in said directors, as trustees, for the benefit of the corporation creditors, and we are of the opinion that when one or more of the directors die the survivors take the whole title subject to the trust (Revised Statutes, article 4555; Perry on Trusts, second edition, sections 499, 492, 493, 412, 343); and that the surviving trustees of the original company were authorized to deal with said property after its dissolution as they deemed proper for the best interest of the company. Especially is this correct when the creditors consent to such action, as in this case. The transfer of the land by Bumpass, trustee, to plaintiffs was done by virtue of an understanding and agreement between the creditors of the original company and the surviving directors thereof. This was done in the interest and for the benefit of the creditors, and defendants have no ground for complaint in this regard. We therefore hold that plaintiffs are entitled to recover all the land sued for that did not pass by the sale under the mortgage.

This brings us to the consideration of the question, whether the Hughes and Slaughter tract and the Mays tract were embraced in the mortgage given by Company No. 1 to the International Trust Company. The record shows that on March 22, 1880, Company No. 1 executed a mortgage to the International Trust Company to secure certain bonds issued by said company. The property covered by said mortgage is described therein as follows: "All and singular the railroad of' the party of the first part as the same now is or may hereafter be constructed from its terminus (describing it), including the right of way, roadbed, superstructure, iron, ties, splices, chairs, bolts, nuts, spikes, all lands and depot grounds, station-houses, and depots, viaducts, bridges, timber and materials and property purchased and to be purchased for the construction and equipment of said road, * * * including all appurtenances and appendages of said railroad, and the property of said company now acquired, used for, and pertaining to the operation of said railroad."

Prior to the execution of the foregoing mortgage said Company No. 1

contracted to purchase the Hughes and Slaughter tract of land, containing 25 acres. The deed to same is dated March 13, 1880, though not delivered until September 5, 1880, when the purchase money was paid for the land. On February 2, 1881, said company purchased the Mays tract. In 1883 the International Trust Company's mortgage was foreclosed, the judgment of foreclosure describing the property as described in the mortgage. The sale of the property was made under said judgment, and the purchasers at said sale organized under the original charter. This company is designated as Company No. 2 in the record. Company No. 2, becoming involved, was sold out under judgment and purchased by Jules Schneider and associates who, on November 13, 1885, reorganized under the original charter, and this company is designated as Company No. 3. On August 30, 1888, Company No. 3 executed a mortgage to the Central Trust Company, the description of the property included in said mortgage being in substance the same as that in the International Trust Company's mortgage. On September 25, 1889, proceedings were instituted in the District Court of Dallas County by the Attorney General of the State of Texas to forfeit the charter of said road. Venue was changed to Ellis County, and on September 14, 1891, judgment was rendered forfeiting said charter and appointing John Gaston receiver of same. In 1883, prior to the sale under the International Trust Company's mortgage, a judgment was rendered against said company in favor of Nason and others. In August, 1886, after the dissolution of Companies No. 1 and 2, and after the organization of No. 3, an execution by virtue of said judgment was levied upon the entire road, franchises, etc., and on the Hughes and Slaughter tract and the Mays tract of land, and said property sold thereunder, E. M. Powell and others becoming the purchasers at said sale. Subsequently, Powell and others deeded their interests to the defendants herein. On September 7, 1891, the Central Trust Company filed in the Federal court at Dallas a bill of complaint against the railroad company for foreclosure of its said mortgage, appointment of receiver, etc. In that proceeding the mortgage was finally foreclosed, the property sold thereunder, and defendants became the purchasers thereof at said foreclosure sale. In said receivership proceedings a judgment was duly rendered canceling the sale of said property to E. M. Powell and others. Various other proceedings were had in said receivership case, but we deem it unnecessary to mention them here.

In addition to the litigation heretofore detailed, there were many other suits, receiverships, and judgments pertaining to said road that are not necessary to mention here, as they have no controlling effect in the determination of the issues here presented.

It is contended by plaintiff that the description of the land in the judicial decrees of foreclosure upon which defendants' title to the lands depend is too general to identify the land, and that extrinsic evidence will not be heard to show what land was intended. The description of the land contained in the decrees of foreclosure is the same as that contained in the mortgages. The land is not described by metes and bounds,

but such as was "purchased and to be purchased for the construction and equipment of said road," or such as was "acquired or which may be acquired in the State of Texas, used for and pertaining to the operation of said railroad."

It is admitted by plaintiffs' counsel that in the foreclosure proceedings extrinsic evidence could have been admitted to show what land was intended, but as that was not done, no title passed by the sale under the decree for the want of a sufficient description, which renders it void. In passing upon a description in a voluntary deed, Mr. Justice Moore, in Kingston v. Pickens, 46 Texas, 101, says: "The construction of a deed, being a matter of law, is for the court. If, therefore, the land intended to be conveyed by it be so inaccurately described that it appears on an inspection of the deed that the identity of the land is altogether uncertain and can not be determined, the court should pronounce it void; but when the uncertainty does not appear upon the face of the deed, but arises from extraneous facts, as in other cases of latent ambiguity, parol evidence is admissible to explain or remove it."

In Smith v. Crosby, 86 Texas, 15, Mr. Stayton, Chief Justice, says: "That extrinsic evidence may be introduced to clearly locate and identify land passing by a sheriff's deed containing an accurate but general description ought not to be controverted, and is not an open question in this court. Wilson v. Smith, 50 Texas, 370; Giddings v. Day, 84 Texas, 608. The rule in this respect is the same, whether the deed be one executed by a sheriff after a sale under execution, or one voluntarily executed by the owner of the land. * * * The law does not require that in such sales the description must be such that the land may be identified by inspection of the levy and deed; and if the description be general, but sufficiently accurate to enable parties to identify the land levied upon and conveyed, by the use of such means as would be admissible in a court of justice for that purpose, then the description should be deemed sufficient."

In Hermann v. Likens, 90 Texas, 448, Mr. Gaines, Chief Justice, says: "What is a certain description in a voluntary conveyance is necessarily certain in a sheriff's or administrator's deed; and it would seem, therefore, that there should be no distinction in this respect between voluntary and involuntary conveyances."

We think it clear from the rulings of the decisions from which we have quoted that there is no distinction between voluntary and judicial sales in regard to the ambiguity in the description of the land sought to be conveyed. From which we conclude that if the description of the land under consideration was contained in a voluntary conveyance, in a suit for a recovery of the land extrinsic evidence would be permissible to show the land intended, though containing only a general description, and that it was proper to show by extrinsic evidence the land upon which the foreclosure was had.

The descriptions of the land in the decrees are not "altogether uncertain," as appears from the face of the deed, and therefore not such as

authorized the court to determine as a matter of law that no title was conveyed thereby.

It is not seriously contended by defendants that the lands in Dallas, Houston, and Kaufman counties, and for which plaintiffs recovered judgment, were so embraced. The contention arises over the Hughes and Slaughter tract and the Mays tract. As to these two tracts the question can not be determined alone from the description given in the mortgages, and it was proper to resort to extrinsic evidence on the trial.

The evidence shows that the Texas Trunk Railroad Company was chartered in 1879 to construct and operate a railroad from Dallas to Sabine Pass, with a branch to the Louisiana line, a distance of about 350 miles. The road was completed from Dallas to Cedar, a distance of about 50 miles. The Hughes and Slaughter and the Mays tracts were purchased after the execution and before the foreclosure of the International Trust Company mortgage. When purchased it was in the country, about one mile from the corporate limits of the city of Dallas. In 1889 the city limits were extended so as to include it, and streets and street car lines have been extended along and across it. Said tract of land contains 25 acres, and is 1680 feet, approximately, north and south, by 650 feet, approximately, east and west. It lies about 1300 feet south of the Texas & Pacific Railroad, the intervening land being, approximately, in the shape of a flatiron, and contains about 17 acres, and is referred to in the record as the "flatiron tract." The Texas Trunk Railroad Company contracted to purchase the "flatiron" tract of the owner, W. H. Gaston, intending it for a terminal, but the purchase money was never paid, and no title ever passed to it. Said company built its road, beginning at the Texas & Pacific road, across the west side of the "flatiron" tract and the Hughes and Slaughter tract, the main track being 48 feet at the north end and 25 feet at the south end from the west line of the Hughes and Slaughter tract. A parallel siding was constructed 12 feet east of the main track, extending from the Texas and Pacific 1307 feet across the "flatiron" tract and into the Hughes and Slaughter tract, joining the main track 434 feet south of the north line. The company bought a small house, 12x14 feet, worth about $25, and a small water tank, worth $75 or $100. These were moved on the land near the north corner west of the main track. The house was used for a ticket office, and the tank to water the engines and cars. Both were intended for use only until permanent buildings should be erected on the "flatiron" tract. A car shed consisting of a plank roof on poles, worth not over $50, was built near the siding. The foundations for a two-stall roundhouse were also laid, but at what time does not appear. It only appears that the remains were found on the land in 1892. At one time a switch extended from the main track west to a connection with the Santa Fe, but this was taken up when they stopped running to the Santa Fe depot. In 1891 a "Y" was on the land, extending east from the main track to about the center of the land. It was taken up in 1892. At what time it was placed there is

not shown. It was a temporary affair, laid on the surface of the ground without any grading. The railroad company never used or needed more than twelve feet on each side of their track for loading and unloading and delivering freight it actually hauled. The soil was black waxy, and it was not possible to haul freight to or from that point in wet weather. It was not suited for a freight and passenger terminal. It was shown by expert testimony that this land would be needed and necessary for a terminal, if the road was constructed as contemplated and operated as it should be. During the most of the time of its existence the road has used the terminals of other roads entering Dallas, except for the wood business.

The jury found in answer to special issues submitted relating to the Hughes and Slaughter tract, in substance, that all of said tract, except 100 feet off the west boundary line of same, was originally acquired by the Texas Trunk Railroad Company for the purpose of subdividing the same into lots and selling the same to employes of the company; that no part of said tract sued for (the 100 feet off the west side not being sued for) was used by said company in connection with the operation of the said road at the date of the execution of the International Trust Company mortgage, March 22, 1880; that there was no evidence that any "Y" existed on the land at the date of the foreclosure of said mortgage on January 31, 1883; that if any part of said 25 acres was used at that time by said railroad, except said 100 feet on the west boundary, it was only of a temporary character; that there was no evidence that any part of said "Y" was used by said railroad at the time of the execution of the mortgage to the Central Trust Company on August 30, 1888; that the part of the 25-acre tract sued for and formerly occupied as a "Y" had been permanently abandoned for such use when the Central Trust mortgage was foreclosed on February 26, 1895.

Also, that no part of said 25 acres sued for except the part occupied by the "Y" was ever actually used for railroad purposes; that, considering the reasonable intention and actual or probable present and future needs of the railroad company when the International Trust Company's mortgage was executed, no part of said land sued for was reasonably necessary for the construction, equipment, repairs, renewals, improvements, completion, operation, or management of the railroad; and that when the Hughes and Slaughter tract was acquired by the railroad company it then was the intention of said company to use the "flatiron" tract for its terminal, and to place thereon its depots and shops.

The Mays tract is 600 feet, approximately, north and south, by 919 feet, approximately, east and west, and contains 11.92 acres, exclusive of railroad right of way. It was deeded to the railroad company on February 2, 1881. This tract is about two miles from the Hughes and Slaughter tract, and is outside of the city limits. Plaintiffs do not sue for a strip 100 feet on each side of the center of the main track of the railroad. The main track of the road runs through this tract, and a switch for sand cars was built on the land, extending at no point more

than 75 feet from the main track. Sand was used from this track to repair the roadbed and for surfacing it and keeping it in order. There is no other place on the road to get sand to ballast the track, except off the right of way. There is no evidence that any sand was taken from the land beyond the 200-foot strip, which is not claimed by plaintiffs, or that any switch was actually put on the land, or any sand taken from it, even inside the right of way prior to September 1, 1891. Said tract of land was never used by said company in any manner other than as above stated.

In answer to special issues relating to the Mays tract, the jury found that the portion sued for, when originally acquired, the company intended subdividing into lots and selling to employes of the company.

The only evidence as to what use the two tracts of land were intended for by the directory of the road at the time acquired by the road, is that of Gen. W. L. Cabell, who was a director and vice-president of the road as originally incorporated, and most of the time its manager and acting president. He testified: "We bought the 25 acres for railroad purposes, laying down switches, and such things as that, and if the land was not required, to sell it into lots for the employes to live on. All that was necessary for tracks and switches was to be used for that purpose. When said 25 acres was purchased it was the intention of the company to use whatever was necessary on the west side of the tract for tracks and switches, and the land on the east side of this was intended to be laid off into lots, and let the men employed by the railroad company purchase them and build residences on them in order to be close to their work. * * * The Mays tract was bought the same way; that is, the railroad should use whatever was needed for tracks and sand, and the balance was to be divided into lots."

It was shown by expert testimony that if the road was properly constructed and operated both tracts were necessary and needed by the company,—the 25 acres tract for terminal purposes, and the 11.92 acres for obtaining sand for ballast, etc.

The court, in addition to submitting special issues to the jury as above indicated, also peremptorily charged the jury to find specially to the effect that the Hughes and Slaughter tract was bought by deed dated March 8, 1880, but not delivered until several months thereafter; that it was the purpose of the company to construct on it its main track, part of its sheds, all necessary switches and side tracks, and, if these did not occupy all the land, then to sell lots cn the eastern side of the land to its employes so that they might be near their work; that no such sales have ever been made, nor has any part of the land been subdivided into lots; that the company built its main track across the land near its western boundary, and also built a side track on it, and a "Y" near the center of it and extending eastwardly across the land to beyond the center of the land, and also built a small house, used as a ticket office and a car shed; that it used in the operation of its road up to 1892 the main and side track and houses; that this was the only land the road owned in Dallas, where it terminated; that both as originally

contemplated and as constructed, if the road had been properly constructed and operated, it would have needed as much as 25 acres for terminal facilities, such as switches, sheds, etc., and such would have been the usual and proper amount for such purpose of such construction and operation.

The court also peremptorily charged the jury to find specially to the effect that the Mays tract was bought on February 2, 1881; that it had sand on it; that the company intended to use sand in the construction and ballasting of the road, and also to place on the land such switches and side tracks as might be necessary in the operation of the road; that the main track was built across it near its eastern boundary, and also a spur track running out from the main track, but near to it, across the land so as to reach the sand; that sand has since been taken from the land and used in the construction and repairing and ballasting of the road; that the road has thus occupied about two acres of the tract; that if the road were properly constructed and operated it would be necessary to use sand to do so properly and successfully. The jury returned a verdict in accord with these instructions, in addition to the finding on special issues.

The question now presented is, was the court, under the evidence and findings of the jury, warranted in rendering judgment for defendants for the Hughes and Slaughter and Mays tracts of land? When, upon a trial, the evidence adduced is such that, as a matter of law, a judgment could be rendered only one way, then the court is authorized to direct the jury to render a verdict accordingly. But where there is evidence tending to support both sides of the controversy, the issues must be submitted to the jury and judgment rendered in accord with the verdict. If, however, the evidence is insufficient to support the verdict, a new trial should be granted. When the case is submitted on special issues, if there is testimony tending to support the findings of the jury, then it is the duty of the court to render judgment in accord with such findings.

We are of the opinion that the evidence did not warrant a verdict for defendants, but warranted the findings of the jury on the issue submitted for their determination. In the case of Shirley v. Railway, 78 Texas, 136, the court, in discussing the question as to when a railroad mortgage embraced subsequently acquired property in the absence of a special description, uses the following language: "The authorities are abundant to the effect that whether subsequently acquired property is included in a conveyance executed by a railway company depends upon its being necessary to the enjoyment of the franchise or the operation of the road, in the absence of special description of it in the conveyance. So, a conveyance of 'all its property, real and personal, acquired or to be acquired, owned or to be owned, used or appropriated for operating or maintaining the road,' does not include lands acquired by the company and not thus used or employed."

Applying the rule here announced, that the after-acquired property to become subject to mortgage must be "used or employed," then the

evidence warrants the conclusion that the International Trust Company mortgage did not embrace the land sued for. There was no use of the 25 acres tract outside of the 100 feet each way, except that part covered by the "Y," and the testimony as to this is too indefinite to impress upon the whole tract the character of having been acquired or used for railroad purposes. Its character must be determined from the conditions that existed before and at the time of the foreclosure of the International Trust Company mortgage, for if the land was not embraced in said mortgage, the use, if any, made of it by Companies 2 and 3 would not affect its status. The evidence does not definitely show when the "Y" was placed on the ground, and as the land was not specifically described in the mortgage, but depended upon extrinsic evidence to show that it was embraced therein, and the burden was on defendants to establish that fact, and it not being shown that Company No. 1 built the "Y," its being on the land would have no probative force.

The only direct evidence as to the intention of the company as to the purposes for which the land was purchased is that of General Cabell. This evidence was objected to on the ground that the intention of the company could not be proven in this matter. If his testimony is to be considered, and we think it should be, then we can conclude that part of the land was to be used for railroad purposes and part for dividing into lots and selling to employes of the road. But what part was acquired for either purpose was a matter to be determined by the jury. He says the western part was to be used for the main track, necessary switches, a car shed, etc. The main track, a switch, a car shed and small ticket office were placed thereon. If the user is to determine the status, then the jury were warranted in concluding that the part used was all that was intended for railroad purposes. If his testimony is not to be considered, then nothing is left, but the use to which the land was put, to determine whether it was acquired for railroad purposes, except the testimony of the expert witnesses as to what land would be necessary and needed if the road had been constructed as originally contemplated and properly operated. What was necessary or needed in the opinion of the witnesses was by no means conclusive in determining for what purpose the land was acquired. The most that can be said of it is that it was simply a circumstance that could be considered by the jury in determining the intention of the directory at the time of its acquisition, and in the absence of the use of the land for railroad purposes the mere intention will not control. Land might be acquired by a railroad that would appear to experts to be necessary and needed for railroad purposes, yet when purchased no intention existed to put it to such a use, and never used for such purpose.

In this case the evidence shows that only a small portion of the land was actually used for railroad purposes, and would not alone be sufficient, as the evidence shows that it was acquired for a double purpose. The jury were authorized to find that Company No. 1 had put to use all that portion it intended for railroad purposes, and intended to sell

the balance to its employes to build upon, which latter can not be held to be for railroad purposes.

Defendants acquired no title by virtue of the conveyance of the land by Powell, for the reason that the sales under execution, at which Powell purchased, were void, the executions having been levied on the land after the dissolution of Company No. 1, and said land had passed into the directors as trustees for the benefit of creditors of said company. Again, said deed had been canceled by a court of competent jurisdiction where the issue was duly called in question and passed upon, thereby rendering Powell's title of no force. Defendants claim Powell's title through a conveyance made after the rendition of said judgment, and, as Powell had no title to convey, the defendants acquired none by said conveyance.

Holding as we do that the lands in controversy were never embraced by the International Trust Company mortgages, it follows that the title to the lands did not pass out of the original company by the foreclosure proceedings of said mortgage, and it is not necessary for us to discuss the other questions presented by the briefs of the parties.

In view of the evidence, we think the trial court erred in giving to the jury peremptory instructions to find certain facts. We are also of the opinion that the evidence supports the findings of the jury on the special issues submitted, and that judgment should have been rendered thereon for plaintiffs. The judgment will therefore be affirmed as to the lands, decreed to plaintiffs, and reversed as to the Hughes and Slaughter and Mays tracts, and here rendered for plaintiffs.

*Affirmed in part.*
*Reversed and rendered in part.*

Writ of error refused.