## CONTINENTAL SUPPLY CO. et al. v. FORREST E. GILMORE CO. OF TEXAS et al.

### No. 3832.

Court of Civil Appeals of Texas. Amarillo.

Nov. 16, 1932.

Rehearing Denied Jan. 4, 1933.

See, also, 48 S.W.(2d) 376.

C. G. Dailey, of St. Louis, Mo., Randolph, Haver, Shirk & Bridges, of Tulsa, Okl., and F. H. McGregor and Fischer & Fischer, all of Amarillo, for appellants.

W. M. Lewright, of Pampa, for appellees.

HALL, C. J.

The appellant the Continental Supply Company (hereinafter called the supply company) instituted this suit against the Forrest E. Gilmore Company (hereinafter called the Delaware company), the Forrest E. Gilmore Company of Texas (hereinafter called the Texas company), the Western Supply Company, Worthington Machinery Corporation of Oklahoma, Joseph Greenspon's Son Iron & Steel Company, and two other companies which were subsequently dismissed from the suit, in which cause the Security Savings & Trust Company of Portland, Or. (hereinafter called the Security company), the Cooper-Bessemer Corporation, the American Tank & Equipment Corporation, and J. F. Pritchard, with leave of the court, intervened.

The plaintiff supply company alleged, in substance: That during 1926 the Delaware company was incorporated under the laws of the state of Delaware, and during the year 1927 the Texas company was incorporated under the laws of Texas. That, in forming the Texas company, the Delaware company, which owned certain property in Texas, transferred said property to the incorporators of the Texas company, which in turn transferred it to the Delaware company in exchange for all of its capital stock, amounting to 50,000 shares of the par value of $1 per share, and, immediately after incorporating the Texas company, the incorporators thereof transferred all of the capital stock of the Texas company to the Delaware company. That the Texas company was recognized and chartered as a corporation un-

der the laws of Texas by the officers, directors, and stockholders of the Delaware company with the intent and purpose of thereby creating a conduit through which the Delaware company could transact its business in the state of Texas, and that the Texas company, since its creation, had been merely an instrumentality and adjunct through which the Delaware company had operated and carried on its business in Texas, in that the Texas company never functioned as an entity; all of its stock being owned by the Delaware company and its directors and officers being the same persons who were directors and officers of the Delaware company, none of whom has ever resided in Texas. That whatever books and records the Texas company had were kept in the office of the Delaware company at Portland, Or., by the agents and officers of said Delaware company. That all property which was acquired in Texas was so acquired by the officers and agents of the Delaware company upon its credit and all debts incurred by the Texas company or in its name were incurred by the officers and agents of the Delaware company. That all debts created in the name of the Texas company which have been paid were paid by the Delaware company and all moneys earned from the property standing in the name of the Texas company were collected and used by the officers and agents of the Delaware company. That, if the Texas company ever had a bank account, it was not created for its benefit and use, but existed merely for the purpose of clearing checks and drafts made payable to it through said account, and, immediately after said items were cleared, receipts therefrom were transferred to the account of the Delaware company and the Texas company never at any time issued any checks against said account for the payment of any debt created in its name. That all checks against said account were for the purpose of transferring the funds therefrom to the Delaware corporation. That, when the Texas corporation was organized by the stockholders, officers, and directors of the Delaware company with its entire capital assets being owned by the Delaware company, it was intended by such stockholders, officers and directors that the Texas company was not to operate and function as an entity, separate and distinct from the Delaware company, but that all property acquired in the name of the Texas company would be acquired by the officers, directors, and agents of the Delaware company upon its credit and paid for with its funds, and that such property would, in fact, be owned by the Delaware company, and, in accordance with said intention, the officers and agents of the Delaware company thereafter erected a large casing-head gasoline refining plant near Pampa, Tex., at a cost of approximately $850,000, upon ten acres of land described in the petition, which is known as the property of the Texas company, but that said company as a separate entity had no money or credit to contribute to the building of said property and in fact as a separate entity it contributed nothing, but said casing-head gasoline refining plant was constructed by the Delaware company under the supervision of its officers and directors with labor for which it paid, and was equipped with machinery, materials, tools, and supplies purchased by the Delaware company for cash or upon its representation that it was the owner of said refining plant, and the Texas company had nothing to do with the construction of said plant and contributed nothing whatever, and has received none of the moneys earned by said plant, but, as alleged, all the earnings have been collected by the Delaware company and paid in to its account. That the Delaware company has at all times controlled and operated said plant, paying the operating expenses. That said Delaware company and Texas company are not now and have never been separate and distinct entities, but they are now and at all times have been a unity, at least in so far as the rights of creditors of either or both of them are concerned, and as to such creditors the property in Texas standing in the name of the Texas company is, in fact, the property of the Delaware company, and is subject to the indebtedness incurred for the materials, equipment and supplies purchased from the plaintiff supply company and used in the construction of said plant.

Plaintiff further alleged: That between May 4, 1929, and June 4, 1930, at the request of Chester A. Sheppard, the president of both the Delaware company and the Texas company, and at the request of R. M. McCalley, the general manager of both companies, it sold and delivered to said companies at Pampa and Kingsmill, Tex., the various items of machinery, materials, tools, and supplies set out in the account marked "Exhibit A," and made a part of the petition, for the total sum of $31,731.89, which machinery, etc., were used by the defendants in the construction of their refining plant upon the premises above described. That no part of the purchase price has been paid. That on August 19, 1930, plaintiff caused its mechanic's and materialman's lien statement to be filed with the county clerk of Gray county, Tex., as provided by the Constitution and laws of the state of Texas.

Plaintiff further alleged a sale to defendants jointly upon the agreement of Sheppard and McCalley that both corporations would make payment of the indebtedness, and further alleged that, relying upon said representations and agreements on the part of said defendants, the plaintiff agreed to deliver to

both companies said machinery, etc., upon the terms and conditions above stated.

Plaintiff alleged in the alternative that, should it be mistaken as to the unity of the defendants, the Delaware and Texas companies, and should the court hold that they were separate and distinct entities and that the refining plant was the property of the Texas company, nevertheless plaintiff was entitled to recover its debt for said materials, etc., so sold and used in the construction of said plant from both of said defendants, and was entitled to a lien and a foreclosure thereof upon said plant for the following reasons: That about April 20, 1929, R. M. McCalley, the general manager of both companies, and C. A. Sheppard, the president of both companies, represented to H. B. Gutelius, the president of plaintiff supply company, that they desired to expand and enlarge their plant, known as plant No. 3, located near Pampa, Tex., and being the property involved in this suit, and desired to make certain additions thereto, for which they would require certain machinery, material, pipe, etc., from time to time during the construction, and desired to purchase the same from plaintiff upon open account on long time, the purchase price for which was not to become due until after the expiration of one year from the date of the first delivery of materials to the property. That they represented to plaintiff and its president, Gutelius, that both the Delaware and Texas companies would be liable for and pay for such materials, etc., that might be furnished by plaintiff and that the Delaware company would guarantee full payment of the same, as it owned and controlled the Texas company, to which latter company the materials, etc., were to be furnished. That they further represented that said two companies were in truth and in fact one and the same. That, as evidence of the agreement on the part of the Delaware company to guarantee the payment for materials to be furnished by plaintiff, it was agreed that said defendant would execute and deliver to plaintiff supply company from time to time notes evidencing the amount of the account. That said officers further represented to plaintiff that, if it would furnish such material, etc., upon the terms above mentioned, the Delaware and the Texas companies would from time to time make payment upon said account as they were able, and that for the purpose of convenience plaintiff was requested to carry the account in the name of the Delaware company and mail invoices to the office of the Forrest E. Gilmore Company at Tulsa, Okl. That, relying upon the representations and agreement upon the part of said defendants, the plaintiff agreed to sell and deliver, upon the terms above set forth, the materials, machinery, pipe, and supplies that might be required in the construction and completion of the refining plant, and did furnish the materials, etc., set out in the attached account marked "Exhibit A" to the extent and of the value of $31,731.89.

Plaintiff further alleged that the Western Supply Company, Worthington Machinery Corporation, Joseph Greenspon's Sons Iron & Steel Company, were asserting liens against the property that were subordinate and inferior to plaintiff's lien, and prayed that they be made parties and for judgment against both the Delaware and Texas companies, establishing its debt and foreclosing its materialman's and constitutional liens upon the property involved. .

The intervener Security company alleged that on March 28, 1930, the Texas company executed and delivered to intervener its note in the principal sum of $500,000, payable to the order of intervener on March 28, 1931, with interest at 7 per cent. per annum, and that said note was secured by a mortgage upon the refining plant, and that said Texas company had defaulted in the payment of said note for the amount of which intervener sought judgment against the Texas company for the full amount, principal, interest, and attorney's fees, and for the establishment of its mortgage as a first and prior lien upon the property involved, and for the foreclosure of the same.

It appears from the record that plaintiff's reply to the intervention of the security company is contained in its second amended original petition, the substance of which we have heretofore set out, and in which it replied that, whatever lien the Security company may have upon the property, it is subordinate and inferior to plaintiff's lien, in that plaintiff's lien had its inception and attached to said property on May 4, 1929, that being the date when it first delivered material, machinery, etc., that said Security company is not a bona fide holder and owner of said indebtedness, but was merely a trustee for the certificate holders referred to in the deed of trust, and that said certificate holders and beneficiaries under the mortgage had actual knowledge of the indebtedness due plaintiff for the materials, etc., or had such knowledge as was sufficient to put them upon inquiry as to plaintiff's debt and lien.

Thereafter the Security company filed its second supplemental petition, admitting that it held the note and mortgage as trustee for the benefit of all persons entitled to the fund to be realized from the payment of the $500,000 note upon which it sued or the sale price of the security which it held, and as such trustee was entitled to maintain its action in intervention for the use and benefit of all persons entitled to the fund, and attached to said pleading a list of the various persons who were alleged to be owners of the fund and holders of certificates of interest in said note. It denied knowledge of the fact of plaintiff's indebtedness against the property in question.

The Cooper-Bessemer Corporation inter-

vened, adopting in part the pleadings of the plaintiff supply company, alleging that it furnished materials, etc., used in the construction of the plant, an itemized statement of which was attached to its petition, of the value of $9,656.17; that it had filed its materialman's lien on May 6, 1931; and prayed for recovery against both the Delaware and Texas companies and for foreclosure of its materialman's lien in the sum of $1,144.06, evidenced by two promissory notes.

Intervener Pritchard alleged that about January 15, 1930, he entered into a written contract with the Texas company, acting through its vice president and legal manager, R. M. McCalley, under the terms of which intervener agreed to dismantle and load on the cars and ship to defendants at Kingsmill, Tex., and there install, eight bay cooling-tower reflux condensers, water pumps, etc., which tower and condensers were at that time located upon the defendant's plant No. 17 in the state of Oklahoma, for which services defendants agreed to pay him $5,693, and further agreed to pay him $771 for additional services not covered by the written contract. Pritchard also claimed a lien upon the plant.

The Delaware company filed no answer in the case.

The Texas company answered, denying that it was a mere instrumentality and adjunct of the Delaware company and alleged: That it was in truth and in fact a separate and distinct corporation from the Delaware company, and as such maintained its own board of directors and officers. That its acts and conduct were controlled and managed by its own officers who acted by authority of its own board of directors. It admitted: That it was indebted to the Delaware company in large sums of money and that the Delaware company received the revenues from the plant at Pampa, Tex. That the Delaware company's superintendent managed and controlled the plant at Pampa. That it made a contract with the Delaware company whereby the latter agreed to construct the refining plant at Pampa, furnishing all materials and labor, at the cost and expense of the Delaware company. That, after said plant was completed the Delaware company was to receive the revenues thereof until it had been repaid the amount it had expended upon said plant for the Texas company.

It further alleged: That the plaintiff and all other interveners and defendants had theretofore accepted notes from the Delaware company in settlement of their respective accounts, for whatever material they each had furnished toward the construction of the plant. That on September 25, 1930, plaintiff supply company and other creditors of the Delaware company executed a creditors' agreement which expressly stipulated that they were creditors of the Delaware company, and that, by reason of having sold and billed said material to the Delaware company and having never billed the Texas company and having accepted notes of the Delaware company and signed said creditors' agreement stipulating that they were creditors of the Delaware company, the plaintiff and said interveners and other creditors parties to said agreement are estopped thereby to assert that said two defendant corporations are one and the same and are estopped to claim any indebtedness against the Texas company or assert any lien upon its plant.

Plaintiff replied by general and special exceptions to said plea of estoppel and further answered: That, if it should be mistaken in its allegation of the unity of said two defendant companies, then it had been misled by the wrongful conduct of said companies and the misleading conditions under which they carried on their business. That they carried on their business with the intention of misleading plaintiff and others in dealing with them. That the two companies were practically identical in name. That the capital stock of the Texas company was owned by the Delaware company. That the majority of the respective boards of directors of each during the period in which the indebtedness was incurred was composed of the same persons. That the officers, managers, and books of accounts of both corporations were the same, and in their general manner of carrying on their business they operated as one without discrimination. That the profits and benefits acquired by each were the profits and benefits of the other. That the debts of the Texas company were treated as the debts of the Delaware company, and vice versa. That the Delaware company published to the world that it was the owner of the refining plant in Texas, and represented that it was the owner of the revenues derived therefrom, and that for said defendants to contend that they are separate and distinct corporations constitutes constructive, if not actual, fraud as against the plaintiff, and that both of said defendants are estopped to deny their indebtedness to plaintiff and estopped to question plaintiff's lien upon the property. Plaintiff further denied the acceptance of the notes of the Delaware company as payment of the debt sued on, and alleged that, in accepting said notes, the plaintiff did not waive the liability of the Texas company for said debt.

The Cooper-Bessemer Corporation, the American Tank & Equipment Corporation, and Pritchard adopted the plaintiff's reply to the answer of the defendant.

Joseph Greenspon's Son Iron & Steel Company, Worthington Machinery Corporation of Oklahoma, and Western Supply Company of Texas filed answers setting up amounts due them, respectively, alleging facts to show the existence of liens in their favor, and prayed for judgment and foreclosure.

During the trial, the plaintiff filed a trial amendment praying for judgment against the Texas company in the sum of $13,719.17, that being the amount shown upon the trial to be unpaid on the purchase price of the machinery, etc., furnished in the construction of the plant, and prayed for the foreclosure of its lien for said amount and for judgment in the further sum of $38,620.62, the balance due from the Delaware company for machinery and equipment furnished said company and used by it in the construction of its gasoline plants in the state of Oklahoma.

After the trial had progressed about ten days, plaintiff filed another trial amendment in which it is alleged: That the Texas company had delivered the note for $500,000 secured by a mortgage to the Security company; it being contemplated that the $500,000 in money would be turned over to the Texas company as consideration for said note. That the Security company then attempted to and has diverted said security from the purpose for which it was given, that is, to secure the payment of $500,000 to the Security company, which company had agreed to lend to the Texas company, such diversion of such security being in this, to wit, that the Security company issued and delivered to C. A. Sheppard and E. L. Hall certificates of interest in whatever amount the Security company might collect from the defendant, the Texas company, upon said note and the security given to insure the payment of said note in exchange and in consideration of said above-named persons who were creditors of the Delaware company releasing and discharging their alleged debts against the Delaware company, and by reason of these facts there has been a diversion of the security from the purpose for which it was given, and therefore said above-named persons who now claim to hold said security in consideration of the release of their debts against the Gilmore company are not entitled to enforce the same; neither is the same intervener Security company entitled to enforce said security for them.

The case was submitted to the jury upon special issues. Based on the answers thereto, the court rendered judgment that plaintiff supply company and interveners Cooper-Bessemer Corporation, American Tank & Equipment Corporation, and Pritchard take nothing; that the intervener Security company recover its debt and have a foreclosure of its mortgage lien upon the plant; that the Western Supply Company and Worthington Machinery Corporation recover judgment for their respective claims and have foreclosure of their respective liens.

The Cooper-Bessemer Corporation, American Tank & Equipment Company, and J. F. Pritchard, together with plaintiff, have appealed.

■ The first special issue submitted by the court is as follows: "Do you find from a preponderance of the evidence that during the times mentioned in the pleadings in this case that the Forrest E. Gilmore Company, the Delaware corporation, and the Forrest E. Gilmore Company of Texas, the Texas corporation, constituted a unity as that word is hereinafter defined to you?"

Appellants' first three propositions attack the action of the court in submitting this issue upon numerous grounds; one of them being that it presents a question of law and not an issue of fact.

In our opinion it does not present an issue of fact, but rather an issue of mixed law and fact, if not an issue purely of law. Whether it presents an issue of law or an issue of mixed law and fact, it constitutes reversible error.

For the purpose of showing that the court should hold that the Delaware corporation and the Texas corporation were not separate entities, plaintiff alleged a great many facts, in addition to the fact that the Delaware company owned all of the stock of the Texas company and that the officers and directors of the one were also officers and directors of the other. It is alleged: That the officers, directors, and stockholders of the Delaware company owned property in the state of Texas, and, with the intent and purpose of creating a conduit through which it could transact and carry on its business in the state, that it organized and created the Texas corporation as an instrumentality and an adjunct for the conduct of its business in this state, and that the Texas company was simply a tool of the Delaware company. That the Texas company never functioned as an entity. That none of its directors or officers ever resided in Texas. That whatever books and records the Texas corporation had were kept in the office of the Delaware company at Portland, Or., and by the agents and officers of the latter company. That all property which was acquired in the state of Texas was so acquired by the Delaware company and upon its credit, and all debts incurred by the Texas company or in its name were so incurred by the officers and agents of the Delaware company and all such debts that have been paid were paid by the Delaware company. That all moneys earned by the Texas company were collected by the officers and agents of the Delaware company and used by said last-named company. That, if the Texas company ever had a bank account, it was created, not for its benefit, but for the purpose of clearing checks and drafts made payable to it through said account, and immediately after said items were cleared receipts therefrom were transferred to the Delaware company. That the Texas company never at any time checked against said account for the payment of any debt created in

628

its name. That all property acquired in the name of the Texas company was contracted for by the Delaware company and all payments were with the funds of said company. That the refining plant at Pampa was erected by the Delaware company under the supervision of its officers and directors and with labor paid for by the Delaware company, and with materials, etc., purchased by the Delaware company upon its credit and upon representation that it was the owner of the refining plant being constructed.

The witness Sheppard, who was president of both companies, admitted the truth of several of the material facts alleged by plaintiff, while there was a conflict of evidence as to other facts.

By proper issues, the court should have submitted the controverted facts to the jury, and, upon consideration of their findings, together with the facts not controverted, the court should have determined the issue of unity or corporate entity, instead of submitting that issue to the jury.

■■ The legal fiction of the separate entities of two corporations, the stock of which is owned by the same parties, should be disregarded when necessary for the prevention of fraud or to protect the legal rights of third parties. Upon ascertainment of all the facts, it is the prerogative of the court and not the jury to look through the forms to the substance of the relations existing between the corporations. Williams v. Freeport Sulphur Company (Tex. Civ. App.) 40 S.W.(2d) 817; Oriental Investment Co. v. Barclay, 25 Tex. Civ. App. 543, 64 S. W. 80; Buie v. Chicago, etc., Ry., 95 Tex. 51, 65 S. W. 27, 55 L. R. A. 861; Fowler v. Small (Tex. Civ. App.) 244 S. W. 1096, 1097; O'Neal v. Jones (Tex. Civ. App.) 34 S.W.(2d) 689; 14 C. J. 61, § 22; Id. 62, § 25; 10 Tex. Jur. 648, § 49.

■ Upon ascertainment of the facts, the courts will disregard the fiction of corporate entity where the fiction (1) is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.

■■ With reference to the first classification, there is testimony tending to show that the supply company was induced to sell its materials, machinery, etc., by the fraudulent representations of Sheppard as to the identity of the two corporations. There is also testimony tending to sustain the allegation under the second classification above that the

Texas corporation was a mere tool of the Delaware company. As to the third classification, where the fiction is resorted to as a means of evading an existing legal obligation, there is testimony showing that Sheppard, Hall, and probably other directors of the Delaware company canceled the alleged indebtedness of said company to them, and, as consideration therefor, took over all that part of the secured $500,000 note which had not been sold by the Security company, thereby preferring themselves as creditors over the general creditors of both corporations. The general rule is that officers and directors of an insolvent corporation, who are its creditors, cannot manipulate the affairs and stock of their insolvent company so as to become its preferred creditors to the injury of general creditors. It is true that the appellant does not by specific allegation attack this transaction as a fraudulent conveyance, but the allegations of fraud with reference to this transaction, and also as to the fraudulent representations through which it is alleged that the supply company was induced to furnish the machinery, were sufficient as against a general demurrer. There is also evidence which tends to show that the corporate fiction is relied upon as a protection to justify the wrongs of their several officers and stockholders.

■ It is true that appellant did not request the trial judge to submit to the jury the controverted issues of facts tending to establish the unity of the two corporations, but, because of proper objections to special issue No. 1 which were overruled, it becomes the duty of this court to consider the assigned error.

■ With reference to the fifth proposition, we think the appellants' pleadings and evidence raised the issue of estoppel, though the pleading was probably not sufficiently specific as against a general demurrer. The record shows that the appellants requested the court to submit the issue, which was overruled. This was error.

■ The depositions of numerous witnesses who are shown to have been purchasers of an interest in the $500,000 note and the holders of certificates showing the extent and terms of their respective purchases were introduced in evidence, over the objections of the appellant. This testimony was immaterial upon the issue of a want of necessary parties, but, since the appellants' allegations denying the validity of the $500,000 note and mortgage and further denying the assignment of any interest therein raised the issue and invited the error, they cannot complain of the testimony.

■ Appellant insists that there has been a defect of parties as interveners, because the Security company, the holder of the

$500,000 note, brought suit to recover thereon and to foreclose the mortgage without making the certificate holders parties. The question of defect of parties was not raised by sworn plea, nor do we think there would have been any merit in the plea if filed. The certificates issued by the Security company and accepted by the several certificate holders as an evidence of their interest in the note and fund, by their provisions, imposed the duty and responsibility upon the Security company to collect the note as it became due and to pay to the certificate holders semiannually their proportionate share thereof, and, in the event of default in the payment, the Security company was empowered and directed to enforce performance of the contract evidenced by the note and mortgage in any manner provided by law without obtaining any further consent from the certificate holders, and the Security company was empowered to so act at its discretion. The provisions of each certificate are tantamount to the grant of a power of attorney to the Security company to file this suit. Moreover, it is the general rule that a trustee holding the legal title of a chose in action is entitled to sue in his own name to recover the amount which may be due the equitable owners. Ormsby v. Ratcliff (Tex. Civ. App.) 22 S.W.(2d) 504; Aldridge v. Pardee, 24 Tex. Civ. App. 254, 60 S. W. 789; Texas W. Ry. Co. v. Gentry, 69 Tex. 625, 8 S. W. 98; Schuster v. Crawford (Tex. Civ. App.) 199 S. W. 327; Richardson v. Beasley (Tex. Civ. App.) 50 S.W.(2d) 420; Bingham v. Graham (Tex. Civ. App.) 220 S. W. 105.

The finding of the jury to the effect that McCalley, the general manager of both companies, did not have authority to make the contract with Pritchard for the work done by him, is not supported by the evidence.

10 Tex. Jur. 981, states the law as follows: "The term 'general manager' of a corporation, according to the ordinary meaning of the term, indicates one who has general direction and control of the affairs of the corporation. * * * Attention is also called to the authority which the manager of any business has to appoint his principal in the ordinary course of the affairs which he has been employed to manage. * * * A general manager may do everything in the transaction of the business of the corporation that the corporation could itself do in its routine and daily business and where he acts as the sole representative within the state, of a foreign corporation, his powers are co-extensive with the powers of the corporation he represents."

The record shows that, under his agreement with McCalley, the general manager, Pritchard performed labor and incurred expenses of approximately $6,000, and that the result of his labors were satisfactory to and have been accepted by the defendants.

By its twelfth, thirteenth, and fourteenth propositions, the appellant insists that the court erred in permitting counsel for the defendants, the Delaware company and the Security company, to endeavor to impeach McCalley upon cross-examination and by proof of certain specific acts and conduct of said witness which were wholly irrelevant and immaterial and had no bearing whatever upon the issues involved.

We sustain this contention, because the record discloses that there has been an unwarranted violation of the rule that a witness cannot be impeached by requiring him to testify to discreditable acts on his part immaterial to the issues in the suit when such proof is elicited from other witnesses and even upon cross-examination of the witness himself. Boon v. Weathered, 23 Tex. 675; Gulf, C. & S. F. Ry. Co. v. Johnson, 83 Tex. 628, 19 S. W. 151.

When McCalley was upon the witness stand, the appellees' counsel was permitted, over appellants' objection, to ask the witness if Sheppard had not personally loaned the witness money to bring his family to Tulsa, and to prove that the witness was in St. Louis a number of times talking to Gutelius, the president of the supply company, after March, 1931. When asked what the witness was doing there, he answered: "That is my business." The court required the witness to answer. The appellants objected, and appellees' counsel stated, in the presence of the jury, that it was a question for the jury whether the witness was conducting his private business in St. Louis, or "cooking up this lawsuit." Over objections of appellants' counsel, he asked this question: "Have you at any time, either before March 13, 1931, the time that your connection with the Forrest E. Gilmore Company of Delaware, or these companies, was severed, or since that time, personally or by letter, U. S. mail or through delivery by any other person, firm or corporation, delivered to or sent to or placed in the possession of the Continental Supply Company, Mr. Fischer, or any other of the parties to this suit, or the attorneys in this suit, any books, records, papers, telegrams, or communications of any kind or character, taken by you from the files or from the office of the Forrest E. Gilmore Co. of Delaware or the Forrest E. Gilmore Co. of Texas, or any other of the corporations involved herein?"

E. D. Ulrich, a witness called on behalf of the Texas company and the Security company, was asked by appellees' counsel the follow question: "Prior to coming to Texas in 1930, had you ever heard or had any one ever told you that McCalley had been authorized by any one connected with the Forrest E. Gilmore Company of Delaware to take oil and gas leases in his own name, charging the expense of agents procuring the same

through the Forrest E. Gilmore Co. of Delaware?"

The witness was allowed to testify from hearsay to a transaction between a Mr. Star and McCalley with reference to some personal leases which McCalley claimed to own in Texas and that subsequently McCalley refused to tell witness anything about his personal affairs, and said witness further testified that on or about March 13, 1931, he had a conference with Sheppard and McCalley in the company's office at Tulsa, and that witness had discovered innumerable irregularities in McCalley's management of the company which were not to the best interest of the company, and that witness went into the office and said to McCalley: "You are the most diabolical rat" (using some profane words) "that I have ever known and even a cur wouldn't bite the hands that feeds it." Ulrich was further permitted to detail what he had said in his abuse of McCalley, calling him an embezzler and a crook, charging that he was grabbing anything he could get, informing him that the witness had intercepted his telephone conversations with Gutelius and found that he was conniving with him, charging that McCalley's action was that of a man who did not belong to decent people, and stating to McCalley: "I will not stay another minute with this company or have anything further to do with it if you are permitted to stay in management of this company and furthermore I don't believe anything or any report that you ever sent to the Portland office from the first day you came into the office until the present time."

The record shows that the witness was talking in a loud voice, and McCalley tried to induce him to hush, and witness said: "Don't 'sh' me at all. I will say what I have to say and furthermore I as a stockholder of the company, whether the other stockholders back me up or not, am going to find out about the taking of the money from this receiver and I personally will put out a warrant for you and you will go before a court and we will find out whether this sort of conduct will be tolerated in the State of Oklahoma." The witness was further permitted to testify that McCalley had purchased a pipe line in Oklahoma from the Continental Supply Company which had never been approved by the directors of the Delaware company, and charged in that conversation McCalley with receiving "cut backs" from the Continental Supply Company.

While it is permissible for a party upon cross-examination or otherwise to ·show the interest and bias or prejudice of a witness and to impeach him by testimony as to his character and reputation for truth and veracity, it is uniformly held to be reversible error for the court to admit evidence relating to specific acts and conduct for the purpose of impeachment. Burchill v. Hermsmeyer (Tex. Civ. App.) 230 S. W. 809; Harrington v. Claflin, 28 Tex. Civ. App. 100, 66 S. W. 898; Missouri, K. & T. Ry. Co. v. Adams, 42 Tex. Civ. App. 274, 114 S. W. 453; Dooley v. Boiders (Tex. Civ. App.) 128 S. W. 690.

The record contains more testimony of the character of that hereinbefore set out, which was clearly inadmissible, and, since appellees' counsel states that McCalley was the chief witness upon whose testimony the appellant was depending to establish its case, the improper evidence admitted over appellants' objection is clearly prejudicial and accounts for the failure of the jury to believe any part of McCalley's testimony with reference to material issues made by the pleadings. This alone would require a reversal of the judgment.

The transcript in this case contains 475 pages. The statement of facts, together with original instruments and documents, including the official records and minutes of the two corporations, approximates 2,000 pages. There is a dearth of references to the record in briefs filed by both parties. We are not able to determine from this unwieldy mass of testimony the merits, if any, of the various creditors' claims of their respective rights to foreclosure of the mechanic's liens. Amongst the original instruments and documents set up, there are contracts in writing, surveys, plots, maps, and diagrams with reference to Greenspon's Son Iron & Steel Company's claim, several hundred pages of invoices attached to what purports to be contracts for materialmen's liens, carbon copies of accounts, invoices, letters, abstracts, drawings, and blueprints of the plant at Pampa, letters and telegrams and carbon copies of others, signed by Sheppard and one or the other of the defendant companies, which, for the most part, have no place in the files of this court.

Rule 72 for district and county courts provides that, when evidence is sufficient to establish a fact alleged by either party, the written instruments admitted as evidence relating thereto should not be copied in detail into the statement of facts, but that the facts thus established should be stated as facts proved in the case. The rule further provides that, if a note or other contract, mortgage, or deed of trust which is the basis of the action or the answer or cross-bill, it may be copied once in the statement of facts; and rule 73 provides that, where there is any reasonable doubt of the sufficiency of the evidence to constitute proof of any one fact under the preceding rule, then the written instrument or parts thereof may be inserted. Rule 75 provides that, where there is no dispute, with reference to the validity or the

correctness of any written instrument adduced in evidence, it should be described and not copied, or else its legal effect as evidence stated as a fact established; and rule 76 further provides that only so much of any such questioned instrument as may be necessary to present the question shall be copied in the statement of facts.

Compliance with these rules would have resulted in an elimination of at least one-third of the cumbersome record which has been filed in this court.

Article 2239 (Rev. St.) as amended by the Acts of the 42d Legislature, First Called Session, c. 34 (Vernon's Ann. Civ. St. art. 2239), provides that any original documentary evidence, sketches, maps, plots, or other matters introduced in evidence shall be transcribed by said stenographer into the said stenographer's report or, if identified in the stenographer's report, may by written direction of the judge be sent up in the original form if requested by either party to the suit, and may be returned to the trial court when the cause is disposed of by the appellate court. It was not intended by the Legislature in the enactment of this statute that the originals or carbon copies of letters, telegrams, records, and minutes of corporations and other private documents should be sent as part of the statement of facts to the appellate courts. Such evidence, or the relevant parts thereof, should be copied into the statement of facts in connection with the testimony of the witnesses who establish the genuineness of such written evidence. With reference to documentary evidence proper, the relevant parts thereof should be copied into the statement of facts, and this requirement is not abrogated by the fact that article 2239 provides that the original document may also accompany the statement of facts upon written order of the trial judge. If the genuineness of any documentary evidence is questioned, either by plea of non est factum or alteration or other plea, it is proper for such documents, such as a deed, patent, note, will, mortgage, etc., to be sent to the appellate court with the record for the inspection of that court.

Some of appellants' assignments are duplicitous and multifarious, but we have considered them, and, with the exception of those hereinabove considered, they are overruled.

So much of the judgment as is in favor of the Western Supply Company and the Worthington Machinery Corporation is affirmed. For the reasons stated, the judgment is reversed as to all other parties, and the cause as to them is remanded.

Affirmed in part, and reversed and remanded in part.